**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:26-cv-23906-JTK**

**JULIAN COX,**
Plaintiff,

vs.

**CITY OF THE MIAMI BEACH**, a municipal corporation, **LEON PAIGE,** individually; **JOSE CARBALLO PEREZ**, individually; **STEVEN FELDMAN**, individually; **KEVIN LORENZO**, individually; **JAVIER FERNANDEZ**, individually; **JOSE TUCCI**, individually; **CURTIS CREWS**, individually,
Defendants.
_______________________________/

## FIRST AMENDED COMPLAINT

On April 16, 2023, Miami Beach police officers unlawfully seized Julian Cox as he drove home from work, violently took him to the ground, and twice tased him despite his attempts to comply. To conceal and justify their misconduct, the officers fabricated criminal accusations that Cox drove drunk, battered an officer, violently resisted arrest, and refused sobriety exercises and a breath test. They incorporated these falsehoods into sworn police documents, causing Cox to face felony and misdemeanor prosecutions and the suspension of his driver's license. Both prosecutions were ultimately dismissed. These violations resulted from the City of the Miami Beach's longstanding custom of tolerating excessive force, permitting officers to fabricate criminal allegations, and failing to investigate and discipline officers despite repeated notice of similar misconduct.

Plaintiff, JULIAN COX, by and through counsel, hereby files his amended complaint and alleges:

## JURISDICTION

1. This is an action for damages exceeding $75,000.00, not including costs, attorney's

fees, and prejudgment interest.

2. The claims asserted arise pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and the laws of the State of Florida. This Court has jurisdiction to hear all claims contained in this action.

3. This court has original jurisdiction over claims brought pursuant to 42 U.S.C. § 1983 and concurrent subject matter jurisdiction over the claims brought pursuant to Florida law.

4. Venue is proper in Miami-Dade County, Florida, because these events took place in Miami-Dade County, which is within the boundaries of the Southern District of Florida.

5. Plaintiff has performed all conditions precedent, in accordance with § 768.28(6), Florida Statutes, and all other requirements, before bringing this action. A Notice of Claims was sent to the City of the Miami Beach (USPS tracking ID 70151520000341049949) and picked up in person at the U.S. Post Office located at 1300 Washington Ave., Miami Beach, FL 33119, on May 8, 2025, at 9:23 am. *See* Exhibit 1. All conditions precedent have otherwise occurred, been performed, been met, been waived, would be futile, or are otherwise inapplicable.

6. This complaint is based on the individual and concerted conduct of the named Defendants in using the police power of the State of Florida to deprive Cox of his constitutional and civil rights. The Defendants' conduct, individually and jointly, violated the rights of Cox under the Fourteenth Amendment to the United States Constitution as well as the statutes and laws of Florida.

7. At all times material to this action, all Defendants acted under color of state or local law.

## PARTIES

8. Plaintiff JULIAN COX (hereinafter the "Plaintiff" or "Cox" or "Mr. Cox") was a resident of the State of Florida at the times alleged in the Complaint.

9. The CITY OF THE MIAMI BEACH (the "City") is a municipal government entity organized under the Constitution and laws of Florida.

10. At all relevant times, STEVEN FELDMAN (hereinafter the "defendant" or "Feldman" or "Captain Feldman") was a duly authorized employee and agent of the Miami Beach

Police Department. Captain Feldman is believed to be a citizen of the State of Florida residing in Miami-Dade and is over the age of 18 years. Feldman is sued in his individual capacity.

11. At all relevant times, LEON PAIGE was a duly authorized employee and agent of the Miami Beach Police Department. Leon Paige is believed to be a citizen of the State of Florida residing in Miami-Dade and is over the age of 18 years. Leon Paige is sued in his individual capacity.

12. At all relevant times, JOSE CARBALLO PEREZ was a duly authorized employee and agent of the Miami Beach Police Department. Jose Carballo-Perez is believed to be a citizen of the State of Florida residing in Miami-Dade and is over the age of 18 years. Jose Carballo-Perez is sued in his individual capacity.

13. At all relevant times, KEVIN LORENZO was a duly authorized employee and agent of the Miami Beach Police Department. Kevin Lorenzo is believed to be a citizen of the State of Florida residing in Miami-Dade and is over the age of 18 years. Kevin Lorenzo is sued in his individual capacity.

14. At all relevant times, JAVIER FERNANDEZ was a duly authorized employee and agent of the Miami Beach Police Department. Javier Fernandez is believed to be a citizen of the State of Florida residing in Miami-Dade and is over the age of 18 years. Javier Fernandez is sued in his individual capacity.

15. At all relevant times, CURTIS CREWS was a duly authorized employee and agent of the Miami Beach Police Department. Curtis Crews is believed to be a citizen of the State of Florida residing in Miami-Dade and is over the age of 18 years. Curtis Crews is sued in his individual capacity.

16. At all relevant times, JOSE TUCCI was a duly authorized employee and agent of the Miami Beach Police Department. Curtis Crews is believed to be a citizen of the State of Florida residing in Miami-Dade and is over the age of 18 years. Jose Tucci is sued in his individual capacity.

17. The causes of action contained in this complaint occurred and accrued in Miami-Dade County, Florida, in the Southern District of Florida.

## GENERAL ALLEGATIONS

## I. The City of the Miami Beach has a decades-long history of police brutality, false arrests, fabricated reports, and official inaction.

18. For more than three decades, Miami Beach police officers have engaged in a persistent pattern of brutality, unlawful arrests, and official dishonesty. The misconduct has involved dozens of officers and countless acts of violence, including beatings, chokeholds, repeated Taser deployments, and shootings. Officers have beaten people already handcuffed, assaulted detainees inside police facilities, and used substantial force against people who posed no immediate threat. Some compounded their unlawful violence by fabricating police reports and criminal accusations to justify their conduct.

19. These were not isolated incidents committed by a single rogue officer. They occurred across successive decades, involved numerous officers, and repeatedly came to the City's attention through civilian complaints, eyewitness accounts, Internal Affairs investigations, use of force reviews, and judicial proceedings. Yet the City repeatedly failed to discipline the officers responsible or take meaningful corrective action.

20. The recurring misconduct was no secret to the City. Its officers committed the violence, its officials received notice, and its disciplinary system repeatedly failed to stop it.

21. The following incidents, documented through previous lawsuits, news articles, reported cases, and other publicly available records, reveal a recurring pattern of police violence, official notice, and institutional inaction.

22. On January 4, 1987, Miami Beach police officers John Krolak, Samuel Azicri, Kevin Graham, Armando Torres, and Sergeant Joseph Brownlow used excessive force against taxicab driver Alexander Brisk following a disputed traffic stop. Brisk testified that officers restrained his arms and legs, struck him with a nightstick, and beat him until he turned blue and stopped breathing. Although the officers maintained that Brisk had resisted and struck an officer, Brisk disputed those accusations. A federal jury found that five officers used excessive force and that a City custom or practice caused the violation. The jury rejected his false-arrest and malicious-prosecution claims, and the decision did not establish fabrication of a police report. *Brisk v. City of the Miami Beach*, 726 F. Supp. 1305 (S.D. Fla. 1989).

23. That verdict placed the City on unmistakable notice that excessive force was not merely the misconduct of individual officers, but an established municipal practice. Yet the City

failed to eradicate that unlawful custom.

24. The practice survived the verdict, persisted for decades through successive police administrations, and remained in force when Miami Beach officers used excessive force against Cox on April 16, 2023.

25. On November 25, 2000, Miami Beach Officers Alan Chin and Stanley Wojeck beat Steve Simpson during an arrest, inflicting serious bodily injuries through unnecessary force. The City imposed no discipline. It required no corrective measures.

26. On September 6, 2003, Miami Beach Officer P. Rice-Jackson arrested Tamara Regla Reyes without lawful justification because she questioned a citation issued while walking her dogs with her husband, Erislandi Aladro. Rice-Jackson threw Reyes against a police vehicle and handcuffed her. When Aladro objected to his wife's mistreatment, Rice-Jackson and Officer Serrano knocked him to the ground, punched him in the face, and kicked him.

27. The abuse did not end with Reyes's arrest. Rice-Jackson pulled Reyes from the patrol vehicle and kicked her in the back. Reyes suffered injuries to her shoulder, back, and knee. Aladro suffered facial lacerations and bodily contusions. Rice-Jackson then falsified the police report, portraying the officers' unlawful violence as necessary self-defense. The officers also brought false criminal charges against Reyes and Aladro. Every charge was dismissed. The City disciplined no officer.

28. In November 2003, Miami Beach Officer J. Ortivero arrested Melissa Plata without lawful justification and threw her face-first onto a concrete walkway, dislodging her prosthetic hand. Ortivero pressed a knee and forearm against Plata's neck and back for several minutes, restricting her breathing. The violence continued at police headquarters, where Ortivero struck Plata in the face. Ortivero then falsified the arrest report to conceal the unlawful arrest and excessive force.

29. In February 2004, Miami Beach Officers Rabelo, Garcia, and McCue entered a private apartment without consent and assaulted its occupant. The City disciplined none of the officers.

30. In February 2004, Miami Beach Officer Kevin Millan and other officers pursued and apprehended a young man on foot. The man had already been subdued. The officers nevertheless repeatedly kicked him in the face and body. The City disciplined none of them.

31. On March 7, 2004, Miami Beach officers arrested Gustavo Toala without probable cause and unlawfully beat him. The City imposed no discipline.

32. In May 2004, a dispute over moving a vehicle at a valet-parking location ended with Miami Beach Officers E. Cruz and G. Gutierrez assaulting a woman. Witnesses observed the officers' excessive force and heard them use racial slurs. The City disciplined neither officer for the excessive force.

33. In August 2004, Miami Beach Officer Nolan stopped a motorist and punched him in the face without justification. The City imposed no discipline.

34. In March 2005, Miami Beach Officer Armatrading was accused of using a Taser three times against a male arrestee during transportation to jail and denying him appropriate medical assistance. Internal Affairs determined that part of Armatrading's conduct was unjustified, but did not sustain all of the alleged misconduct.

35. On June 30, 2005, Miami Beach Officers Douglas Simon, Dimitris Gotsis, and Thomas Lincoln beat Angel Melendez while he lay face-down on the ground, already handcuffed. Fellow Miami Beach Officer Sunday Garcia reported witnessing the officers kick and strike Melendez and physically mistreat him while he remained restrained. Even with an officer reporting the abuse, the City disciplined none of the officers for the excessive force.

36. In March 2006, Miami Beach Officer D. Smith struck a man three times following an arrest for suspected driving under the influence. The City imposed no discipline for the excessive force.

37. In March 2006, Miami Beach Officers Jose Reina, E. Holbrook, and another officer beat an arrestee inside the police department's own holding area. The beating left substantial bruising along the man's left side. The City disciplined none of the officers for the excessive force.

38. On May 27, 2006, Miami Beach Officer Jenny Velazquez and other officers detained Bruce Sapp and David Martin while their vehicle was lawfully stopped. Velazquez forcibly pulled Sapp from the passenger seat. The officers repeatedly slammed both men's heads and upper bodies against the vehicle. After Sapp had been restrained, Velazquez discharged her Taser at least three times around his neck, aggravating a preexisting spinal condition. Neither man had resisted or committed an offense warranting arrest or force. The City disciplined no officer for the excessive force.

39. On June 21, 2007, off-duty Miami Beach Detective Jorge Mercado followed Juan Dapena into a bathroom and punched him in the face during an altercation. Witnesses observed the violence. The City imposed no discipline for the excessive force.

40. On September 17, 2007, Miami Beach Officers Deborah Doty and Robert Azicri subjected Ian Cooley to a violent assault following a police encounter. The officers pulled Cooley from a vehicle, slammed his head against the vehicle, and choked him. The beating continued at police headquarters, where officers struck him again. Cooley allegedly suffered a ruptured right eardrum and hearing loss.

41. On December 9, 2007, Miami Beach Detective Jose Reina and other officers fired multiple gunshots at a man identified as Eliseo or Elisia Labruno as he fled following a dispute over a taxicab fare and the passenger's belongings. Witnesses observed Labruno fleeing with nothing in his hands but a shirt. Reina still fired at Labruno while he hid beneath a vehicle, striking and wounding him. The City imposed no discipline for the excessive force.

42. On April 27, 2008, Miami Beach Officers Phillip Elmore and Frederick Dominguez used excessive force against Lisette Luna because she attempted to photograph police conduct near Ocean Drive and 9th Street. The officers attempted to seize Luna's camera and injured her wrist and lower back, causing injuries that included a herniated disc. Luna reported the misconduct to Internal Affairs the next day. Internal Affairs sustained four of her five allegations, including excessive force. Only the allegation that officers stole her camera was not sustained. This represented the rare instance where an officer was disciplined for excessive force.

43. On June 28, 2008, Miami Beach Officers Philippe Archer, Neill Fagan, and Mishart Torres arrested Miguel Lawson without probable cause. At Lawson's first appearance, a judge determined that probable cause was lacking. The City disciplined none of the officers for the unlawful arrest.

44. On October 8, 2008, Miami Beach Officers Alerto Estraviz, Steven Duque, and Joseph Duque used a Taser and other excessive force against Carlos Acutin during an arrest, inflicting serious physical injuries. The City imposed no discipline for the excessive force.

45. On February 28, 2009, Miami Beach Officers Alexander Torres and Luis King fabricated criminal allegations against Denrick Bruce, falsely accusing him of speeding and participating in a cocaine transaction. Their false accusations were used to justify an unlawful

arrest. The City disciplined neither officer for the false arrest or fabricated police report.

46. On March 8, 2009, Miami Beach Officers Andy Lozano, Julio Blanco, and Raymond Chambers violently attacked Steven Gomez during an arrest on South Beach. The officers tackled Gomez, pinned him to the ground, and repeatedly punched him in the face. The beating broke his teeth and fractured his eye socket.

47. On June 14, 2009, Miami Beach Officer Adam Tavss shot and killed Husien Husam Shehada while investigating a report that two men were carrying a concealed firearm. Shehada was ordered to raise his hands. Shehada complied, raising his empty hands before Tavss opened fire. The bullet struck Shehada's arm and caused a fatal injury to his aorta.

48. On June 26, 2013, Miami Beach Officer Philippe Archer used improper force against Megan Adamescu while she was handcuffed inside police headquarters. Archer then attempted to conceal the misconduct by failing to prepare the required report documenting his use of force.

49. On August 17, 2013, Miami Beach Officer Joseph Gonzalez arrested Nevill Duncan for a burglary he had not committed during an investigation involving a stolen cellphone. Gonzalez then made false statements in official police reports to justify Duncan's arrest. The City imposed no discipline.

50. On March 24, 2017, Miami Beach Officer Christopher Aguila struck Richard Johnson in the face with his elbow while Johnson stood inside a police holding cell. Officer Eugenio Abay also struck Johnson. The violence occurred against a man already confined inside the City's own detention facility.

51. On December 10, 2019, Miami Beach Officers Melissa Rosa, Daniella Moreno, and Corey Jackson attacked Jamie Senko while he sat inside his vehicle. Senko had fallen asleep while waiting to proceed. Rather than reasonably investigate the circumstances, the officers resorted to force, dragging Senko from his vehicle and inflicting serious bodily injuries.

### A. Accompanying practice of falsifying reports and manufacturing criminal accusations.

52. The City's longstanding custom of excessive force was accompanied by an equally disturbing practice: officers falsifying police reports and manufacturing criminal accusations to conceal and justify their misconduct. Rather than accurately report their use of force, officers

falsely accused their victims of resisting arrest, assaulting police officers, and committing crimes they had not committed. These fabrications led to unlawful arrests, prolonged detention, and criminal prosecutions that prosecutors later dismissed. The false reports served two purposes: to shield officers from accountability for their violence and to transform the victims of that violence into criminal defendants. The following incidents, also taken from civil complaints, news articles, reported cases, and other available public records, demonstrate that the City had longstanding notice of this practice.

53. In June 2004, Miami Beach police officers beat a male detainee and used chemical agents against him inside the City's holding facility. The officers then falsified the incident report, claiming the detainee had inflicted his own injuries rather than admit that police officers caused them. The City disciplined no officer for either the excessive force or the false report.

54. In November 2004, Miami Beach Officers E. Cruz, G. Gutierrez, and J. Pereira attacked a man leaving a nightclub. The officers knocked him to the ground, repeatedly struck him, deployed a Taser against him, and fractured his nose. They then falsified the arrest report, accusing their victim of felony battery on a law enforcement officer and other criminal offenses to conceal and justify their violence. Independent witnesses contradicted the officers' account. Prosecutors dismissed the criminal charges. Internal Affairs nevertheless failed to hold every officer accountable for the full scope of the misconduct.

55. On January 15, 2005, Miami Beach Officer Michael Muley repeatedly shot an unarmed man identified as Robbins after officers confronted him inside a public restroom. Robbins was disoriented and fled in fear when officers entered the restroom with their weapons drawn. Muley opened fire, inflicting critical gunshot wounds that required hospitalization. Officer Prfogner failed to intervene. The officers then constructed a false account of the encounter to justify the shooting. The City disciplined no officer for either the excessive force or the false report.

56. On April 10, 2005, Miami Beach Officer Newell Wilder arrested Broy Kenneth Rodriguez without probable cause. Wilder then fabricated a police report to justify the unlawful arrest.

57. On February 4, 2008, Miami Beach Officer Phillip Elmore arrested Dario Vasquez and transported him to a secluded alley rather than police headquarters. There, Elmore beat Vasquez for approximately ten minutes, repeatedly punching and kicking him despite his

compliance and lack of resistance. The beating fractured three of Vasquez's ribs, ruptured his right rotator cuff, and injured his face, head, and neck. Elmore then falsified his police report, blaming Vasquez's injuries on a fall rather than admit that he had inflicted them.

58. On February 16, 2008, Miami Beach Officers Philippe Archer, Michael Muley, and Bernadette Maher unlawfully detained Andres Duquesne after he sought help from uniformed officers because Archer, dressed in plain clothes, had been following him. Rather than assist Duquesne, the officers seized him. Muley and Archer punched Duquesne after he was handcuffed and placed in a patrol vehicle. The abuse continued at police headquarters. The officers then manufactured criminal charges against Duquesne, accusing him of battery on a law enforcement officer, cocaine possession, resisting an officer, and drinking in public. Duquesne remained in custody for a substantial period before prosecutors dismissed the charges.

59. On December 2, 2008, Miami Beach Officer Peter Wyatt arrested Edward Blackshear without probable cause while directing traffic for a funeral procession. Blackshear had complied with Wyatt's instructions. Wyatt nevertheless falsely accused him of disobeying lawful commands and resisting arrest. To justify the unlawful seizure, Wyatt falsified police reports, claiming Blackshear refused to obey commands and physically resisted. Prosecutors dismissed the charges. The City imposed no discipline for the false arrest or fabricated reports.

60. On February 28, 2009, Miami Beach Officers Alexander Torres and Luis King fabricated criminal allegations against Denrick Bruce, falsely accusing him of speeding and participating in a cocaine transaction. The officers used those accusations to justify his unlawful arrest. The City disciplined neither officer for the false arrest or fabricated police report.

61. On March 13, 2009, Harold Strickland called 911 to report Miami Beach police officers beating a handcuffed detainee near Flamingo Park. Rather than investigate the abuse Strickland reported, Officers Frankly Forte and Elliot Hazzi arrested him. Forte then falsified the arrest affidavit, accusing Strickland of approaching approximately six parked vehicles, attempting to open their doors, and hiding behind a truck when officers approached. Prosecutors dismissed Strickland's criminal charges.

62. On January 10, 2010, Miami Beach Officer Nicholas Guasto stopped Antwon Emery without reasonable suspicion or probable cause. Emery had been driving lawfully. He complied with the officer's requests for his license and registration and voluntarily exited his

vehicle with his hands raised. Guasto nevertheless slammed Emery against the trunk and placed him in painfully tight handcuffs. To justify the unlawful stop and force, Guasto then made false sworn statements accusing Emery of failing to stop and refusing to comply with police commands.

63. On March 26, 2011, Miami Beach Lieutenant Douglas Simon arrested Abelardo Soto after Soto approached officers to express concern about a security guard restraining another man during a public disturbance. Simon sustained an injury to his forehead during the encounter. Officer Nicholas Guasto then falsified the arrest report, accusing Soto of inciting a crowd to attack Simon, repeatedly throwing sand at Simon, and striking Simon in the forehead with an unidentified weapon.

64. In 2011, Miami Beach Officers Eric Figueroa and Robert Azicri detained Sergio Rivas and Robert Navarrete after observing the men pretend to record a traffic stop with their cellphones. The officers seized and searched their phones, then severely beat both men without lawful justification. Figueroa and Azicri subsequently collaborated to prepare false sworn arrest affidavits, accusing Rivas and Navarrete of disorderly conduct to justify the unlawful seizure and violence. Prosecutors dismissed both criminal cases.

65. On June 26, 2013, Miami Beach Officer Philippe Archer used improper force against Megan Adamescu while she was handcuffed at police headquarters. Rather than document his use of force, Archer attempted to conceal it by failing to prepare the required report. The omission concealed the officer's conduct from the official record.

66. On April 4, 2016, Miami Beach Officers Jesus Dominguez and Michelle Sayegh stopped Niki Livingston without lawful justification, using a purported traffic violation as a pretext to search for drugs. The officers harassed and battered Livingston during the encounter. Their search uncovered no drugs on Livingston or inside her vehicle. Nevertheless, the officers arrested her and falsely charged her with a criminal traffic offense.

### B. In the five years preceding Cox's arrest, the City received repeated warnings of police brutality, fabricated evidence, and coordinated misconduct involving numerous officers.

67. In the five years preceding the constitutional violations against Cox, the City was confronted with even more allegations of serious misconduct involving at least **eighteen** Miami Beach police officers. The accusations included excessive force against defenseless individuals,

unlawful arrests, fabricated criminal allegations, and the prosecution of victims to conceal police misconduct. The misconduct was captured on body-worn cameras, exposed through civil litigation, and, in some instances, resulted in criminal charges against the officers themselves.

68. The misconduct was not confined to isolated officers acting alone. Multiple officers participated in unlawful force, other officers stood by without intervening, supervisors witnessed the abuse, and officers subsequently prepared false official accounts, supported by their supervisors, to justify their conduct. The same practices that produced these incidents were still present when Miami Beach police officers encountered Cox on April 16, 2023.

***1. Miami Beach Officers Beat Cody Wade Unconscious; City Settles for $130,000.***

69. On June 28, 2019, Miami Beach Officers Alfredo Garcia and Agustin Rodriguez encountered Cody Wade outside Mango's Tropical Cafe, where he had been accused of disorderly behavior. What followed was a violent arrest captured on police body-worn camera footage.

70. While Wade lay on the ground, Officer Garcia delivered approximately five consecutive elbow strikes to his face, apparently rendering him unconscious. Garcia and Rodriguez then dragged Wade across the street to the sidewalk, where he lay apparently unconscious for approximately twelve minutes until paramedics arrived.

71. Wade suffered serious injuries, including a traumatic brain injury. The officers arrested him on charges that included resisting an officer. Prosecutors ultimately abandoned the criminal charges.

72. Wade brought a federal civil-rights action against the City and the officers in July 2021. In September 2022, approximately seven months before Cox's arrest, the City agreed to pay $130,000 to settle Wade's lawsuit.

***2. Five Miami Beach Officers Criminally Charged Following the Violent Beating of Dalonta Crudup and the Arrests of Two Witnesses.***

73. On July 26, 2021, Miami Beach police officers pursued Dalonta Crudup into the Royal Palm Hotel, where he surrendered. Rather than simply take him into custody, multiple officers beat him while he was on the ground. The attack occurred in the presence of numerous officers, including supervisory personnel.

74. The officers punched, kicked, and struck Crudup while he lay face-down, including after he had been handcuffed. The officers' own body-worn cameras and hotel surveillance footage captured their violence.

75. The officers also attacked and arrested two bystanders who recorded the misconduct. Khalid Vaughn was assaulted and arrested while using his cellphone to record the beating. Sharif Cobb was likewise arrested while recording police conduct. The City subsequently settled Vaughn's claims for $119,000 and Cobb's claims for $65,000.

76. The misconduct resulted in criminal charges against five Miami Beach police officers, three of whom faced felony charges. The charges included battery and official misconduct arising from the officers' violence and alleged falsification of official records. Sergeant Jose Perez pleaded guilty and received probation. On March 8, 2023, a jury found Officer Kevin Perez guilty of battery for his participation in the beating of Crudup.

77. Thus, before Cox encountered Miami Beach police officers on April 16, 2023, the City had already witnessed five of its officers criminally charged in connection with a coordinated assault, one officer enter a guilty plea, and another officer be found guilty by a jury. The misconduct involved not merely excessive force, but assaults on witnesses, unlawful arrests, and its employees colluding to falsify the official account of what transpired in order to conceal their unconstitutional behavior.

***3. Sergeant Vincent Stella Attacks Mariyah Maple; Officers, Including Captain Feldman, Allegedly Coordinate a False Arrest and Criminal Prosecution.***

78. On July 25, 2021, Mariyah Maple used her cellphone to record Miami Beach police officers arresting a teenager. Maple was unarmed, compliant, and engaged in no conduct justifying force. Multiple officers, including Captain Steven Feldman, were positioned where they could observe the encounter.

79. Sergeant Vincent Stella approached Maple, raised his police bicycle with both hands, and slammed it into her right arm and knee. Before Maple had an opportunity to comply with Stella's command to move, he sprayed her directly in the eyes with a chemical agent from less than two feet away.

80. Maple fled to her mother's vehicle, suffering the effects of the chemical spray.

When Maple requested medical assistance and her mother complained about the officer's conduct, the officers did not simply investigate the complaint. Instead, they undertook to protect Stella from civil liability by arresting the person he had just assaulted.

81. Officer Bercian contacted Sergeant Stella after learning that Maple possessed video evidence of the assault. Maple alleged that Stella acknowledged she had violated no valid law but nevertheless directed her arrest because she had requested medical assistance and might bring an excessive-force lawsuit against him.

82. Stella, Captain Feldman, Major Doce, Lieutenant Diaz, Sergeant Perez, and several other officers reached an understanding to arrest Maple, prosecute her, and conceal the unlawful force. The alleged misconduct thus extended from the officer who administered the force to supervisory officers occupying positions throughout the Department's chain of command.

83. Officers subsequently arrested Maple under a City ordinance regulating interference with police activity. Officer Bercian and Sergeant Perez prepared and signed an arrest affidavit in consultation with Stella. The affidavit falsely accused Maple of criminal conduct that video evidence contradicted. On September 2, 2021, the City's prosecutor dropped the criminal case.

84. Maple brought a federal civil-rights action against the City and the involved officers. Her allegations placed the City on express notice that officers, including Captain Feldman, had participated in or witnessed unlawful force, failed to intervene, and allegedly coordinated the fabrication of criminal allegations to justify an arrest and discourage a civil-rights lawsuit.

#### ***4. Officer Adriel Dominguez Beats Lowell Poitier and Is Accused of Falsifying an Arrest Affidavit.***

85. On December 3, 2018, Miami Beach Officer Adriel Dominguez encountered Lowell Poitier at the Pelican Hotel in Miami Beach. During the encounter, Dominguez struck Poitier with sufficient force to knock him unconscious. Poitier was transported to Mount Sinai Hospital for emergency medical expenses.

86. Dominguez subsequently arrested Poitier and prepared a sworn arrest affidavit accusing him of criminal misconduct, including causing a disturbance. Poitier challenged the truthfulness of the officer's account, relying in part on body-worn camera footage that contradicted

portions of the official narrative.

87. On July 1, 2019, the Miami-Dade State Attorney's Office dismissed the criminal charges against Poitier. Upon information and belief, the City subsequently settled Poitier's civil claims.

#### *5. The City Was Warned That Officer Paige Had Participated in an Unlawful, Violent Arrest and the Initiation of False Felony Charges.*

88. On December 5, 2020, Miami Beach Officers Leon Paige, Adriel Dominguez, and Adrian Dominguez confronted William Sarubbi while he sat inside a parked vehicle near 9th Street and Washington Avenue about marijuana possession.

89. Sarubbi offered to produce his medical marijuana card after the officers accused him of possessing marijuana. The officers ignored him. Without lawful justification, the officers reached into his vehicle, seized his hands and neck, and forcibly dragged him from the vehicle.

90. The officers then arrested Sarubbi and falsely accused him of battery on a law enforcement officer and resisting an officer with violence.

91. Eight body-worn cameras recorded the encounter. After reviewing the footage, the Miami-Dade State Attorney's Office dismissed the criminal charges.

92. On December 12, 2022, William Sarubbi commenced a civil action in Miami-Dade County Circuit Court against the City of the Miami Beach and Officers Adriel Dominguez, Adrian Dominguez, and Leon Paige. The action concerned alleged unlawful police conduct involving Sarubbi's arrest and criminal prosecution.

93. On March 27, 2023, City Attorney Rafael A. Paz issued a formal litigation status report to Mayor Dan Gelber and the members of the Miami Beach City Commission. The report specifically identified the Sarubbi lawsuit, named Officers Adriel Dominguez, Adrian Dominguez, and Leon Paige, and described the action as involving the arrest and prosecution of Sarubbi in alleged violation of state law and 42 U.S.C. § 1983.

94. The City Attorney's memorandum established that the City's highest governing officials had received formal notice of the litigation before Cox's arrest. The warning was not buried in an Internal Affairs file or confined to the knowledge of a patrol supervisor. It was delivered directly to the mayor and the City Commission.

95. A mere twenty days later, on April 16, 2023, Officer Paige participated in the police encounter that resulted in the unlawful force and arrest of Cox. Paige was thus among the officers whose conduct had already been placed at issue in civil-rights litigation formally reported to the City's governing officials before Cox's constitutional rights were violated.

96. By April 16, 2023, the City had received repeated and specific warnings that its officers used excessive force, unlawfully arrested individuals, and allegedly fabricated criminal accusations to justify their conduct.

## II. The City's Longstanding Practices Were Repeated Against Julian Cox.

97. The constitutional violations against Cox were not an isolated departure from the Miami Beach Police Department's longstanding practices. The City had been warned repeatedly that its officers used unlawful force, accused their victims of resisting arrest or assaulting police officers, and then relied on false official accounts to justify their conduct. On April 16, 2023, the same pattern repeated itself. Officers confronted Cox, refused to explain their actions, escalated the encounter into violence, and then accused him of criminal conduct to justify the force they had used. The result was an unlawful seizure, two Taser deployments, felony charges, a DUI prosecution, and the destruction of a career Cox had spent years building.

### A. Julian Cox

98. Julian Cox is a nationally renowned mixologist who spent years building a distinguished career in the hospitality industry.

99. On January 18, 2022, MGM Resorts appointed Julian Cox as its Executive Director of Beverage and Corporate Mixology, a senior leadership position reflecting his professional accomplishments.

100. Cox's success led to another opportunity. Riviera Dining Group (RDG), one of the largest restaurant groups in the United States, selected him as its Executive Vice President for Food & Beverage. In that position, Cox oversaw the Directors of Operations and reported directly to RDG's Chief Executive Officer.

101. Cox moved his family to South Florida and purchased a home. He intended to make South Florida his permanent home and continue building his career with RDG.

102. Among Cox's professional responsibilities was ensuring that employees and managers under his supervision did not consume alcohol while working.

**A. The International Association of Chiefs of Police**

103. The International Association of Chiefs of Police is a national professional organization composed of law enforcement executives that develops model policies and best-practice guidance for police agencies. In 2019, the IACP published model policies governing investigatory stops.

104. When conducting an investigatory stop, those model policies provide that "Officers shall, as soon as feasible, explain to the stopped individual(s) why they were stopped."

105. The U.S. Department of Justice recommends the implementation of policies requiring "officers to state the reason for the stop and the reason for the search if one is conducted."

106. The Police Executive Research Forum (PERF) is a national research and policy organization focused on improving policing practices through empirical research, training, and model guidance.

107. In 2016, PERF published common-sense guidelines for training and defusing critical incidents. Those guidelines instruct that law enforcement officers should make requests clear and one at a time, and that, "[w]henever possible, communicate your actions in advance (e.g., 'I am going to handcuff you now because . . . .')." The guidelines further instruct that police should issue clear, simple commands.

108. These common-sense guidelines exist to ensure that persons seized by law enforcement have clear instructions to follow and understand what is occurring during the police encounter.

109. The Miami Beach Police Department ignored these common-sense guidelines during its encounter with Mr. Cox.

**B. The Traffic Stop and Seizure of Cox, Where Officers Gave Unclear and Conflicting Commands While Cox Remained Uninformed of the Nature of the Seizure.**

110. On April 16, 2023, Mr. Cox was overseeing operations at the newly reopened Baoli, Miami Night Club, 1906 Collins Ave, Miami Beach, FL 33139, as well as Mila Miami at 1636 Meridian Avenue Rooftop, Miami Beach, FL 33139.

111. Significantly, one of Mr. Cox's responsibilities included making sure that staff and reporting managers were not drinking.

112. At approximately 2:11 a.m., Officer Paige initiated a traffic stop of Plaintiff Julian Cox near Dade Boulevard and Meridian Avenue in Miami Beach, Florida, no more than two blocks from Baoli and Mila Miami.

113. Before he was stopped by Officer Paige, Cox was operating his vehicle in a careful and prudent manner and in full compliance with all applicable traffic laws and regulations.

114. Cox complied and stopped his vehicle.

115. Officer Paige ordered Cox to turn the car off. Cox said he was complying. Officer Paige then yelled, "Okay, so do it then, mother***ker. Turn the car off." Cox complied by turning the car off. (Ex. 2, Tasing - Paige BWC).

116. Officer Paige unholstered his firearm, approached the truck, and ordered Cox to exit. Cox complied.

117. Officer Paige did not explain the reason for the stop and did not inform Cox whether he was being detained or arrested.

118. Officer Paige pointed his firearm at Cox and ordered him to turn around and put his hands on the truck.

119. Cox raised his hands with his palms visible and spread his feet, a posture commonly understood as a gesture of surrender. Cox asked why this was happening and said he had not done anything wrong:




120. Officer Paige repeated the command without explanation. Cox again asked why the officer was doing this to him and said, "You just pulled me over. I pulled over. I'm compliant. I'm compliant," with his hands still raised.

121. Cox did not yell, scream, berate, curse, or use profanity during the encounter. Body-worn camera audio reflects that his voice was not raised.

122. With his hands still raised, Cox complied by turning around and placing his hands on the truck.

123. Officer Paige still did not tell Cox the reason for the stop or inform him that he was being arrested, detained, or handcuffed.

124. While facing away from Officer Paige with his hands on the truck, Cox felt his arm grabbed aggressively from behind.

125. Cox turned his head and upper body away from the truck to see what was happening to him. He did not kick, punch, or offer violence toward any officer.

126. Without warning, Officer Paige lifted Cox off his feet in a two-leg takedown maneuver.

127. Officer Paige later claimed the force was justified because Cox resisted his efforts to handcuff him. Cox, however, had never been told that he was being handcuffed, detained, or

arrested, and was facing away from Officer Paige at the time.

128. Cox did not resist police action, because he was not made aware of Paige performing some lawful duty.

129. Captain Feldman was positioned behind Cox. As Officer Paige attempted to take Cox to the ground, Captain Feldman held Cox, slowing the takedown.

130. Officer Carballo-Perez arrived during this sequence. His body-worn camera recorded Officer Paige holding Cox's legs while Captain Feldman was positioned between Cox and the ground (Ex. 3, Tasing - Carballo-Perez BWC):






131. After Captain Feldman moved out of the way, Cox landed on his back and lay flat on the ground in a supine position.

132. Although Cox was already lying flat on the ground, an officer repeatedly shouted for him to "get on the f**ing ground."

133. Cox asked, "What are you doing?" and "Why are you trying to beat me up?" No officer explained what was happening.

134. Multiple officers grabbed Cox's limbs and began pulling his body in different directions. One officer held his leg while two others held his arms.

135. While physically restrained in that position, Cox was ordered to place his hands behind his back. The officers gave the command while holding and pulling his arms and legs, preventing him from moving freely to comply. No officer explained how Cox could place his hands behind his back while remaining flat on the ground as Paige had instructed.

136. Officer Carballo-Perez drew his taser and pointed it at Cox. He instructed Paige to step back. Paige, understanding the warning to mean Cox would be tased, reached toward Feldman and pulled him away from Cox.

137. Once the officers released Cox, he did not rise from the ground, attempt to escape, kick, punch, or act aggressively. He remained lying on his back, as instructed.

138. Officer Carballo-Perez told Cox to stop moving. Cox immediately complied.

139. After aiming his taser at Cox for approximately eight seconds, Officer Carballo-Perez deployed his taser while Cox lay on the ground in a supine position with his hands raised, not moving, **complying with his command**:




140. During the Taser deployment, Carballo-Perez issued conflicting commands, ordering Cox to "stop moving" while also directing him to put his hands behind his back. The commands required incompatible physical responses from a man lying on the ground while being subjected to an electrical discharge.

141. Shocked, Cox cried out, "You just shot me. You just shot me."

142. As officers again grabbed Cox and pulled his body in different directions, Cox continued receiving simultaneous and conflicting commands from different officers.

143. Officer Kevin Lorenzo arrived on scene at around this time, drew his taser, and pointed it at Cox. Cox was not punching, kicking, or otherwise attacking the officers. (Ex. 4, Tasing – Lorenzo BWC).

144. Carballo-Perez continued ordering Cox to stop moving and place his hands behind his back. At the same time, Paige directed Cox to turn around.

145. Although other officers were physically restraining Cox and preventing him from

turning, Cox attempted to comply with Paige's instruction, responding, "Let me turn around, I will turn around."

146. Lorenzo had been present for no more than fifteen seconds. Rather than permit Cox to comply with Paige's instruction, Lorenzo urged further force, shouting, "F***ing tase him."

147. Carballo-Perez complied with Lorenzo's demand. He directed Captain Feldman to release Cox and discharged his Taser a second time. Cox remained on the ground with his hands raised, offering no violence toward any officer.

148. Officer Tucci transported Cox to the hospital and then to TGK for formal processing.

149. The officers did not stop at using force against Cox. They accused him of criminal conduct, portraying him as intoxicated, violent, resistant, and unwilling to submit to a breath test. Those accusations were false.

150. The officers' accusations resulted in Cox being jailed and charged with multiple felony and misdemeanor offenses, including driving under the influence, battery on a law enforcement officer, and resisting an officer.

151. Cox was jailed and charged with multiple felony and misdemeanor offenses.

152. The State Attorney's Office ultimately dismissed the DUI prosecution. Cox initially entered a pretrial intervention program in connection with the felony charges.

153. After the State Attorney's Office received exculpatory evidence from the DUI proceeding, it dismissed the felony prosecution without requiring Cox to complete the remaining conditions of his pretrial intervention agreement.

## III. The Cover Up.

154. The officers' violence against Cox was followed by a coordinated effort to conceal and justify it. Rather than truthfully document the encounter, the officers manufactured a different account. In their official reports, Cox became a reckless and intoxicated driver who defied lawful commands, violently attacked police officers, and refused sobriety and breath testing. The officers supplied those accusations through arrest affidavits, DUI reports, sworn statements, and other official documents. The DUI Paperwork is attached as Exhibit 5. The accusations were false. They served to justify the officers' conduct, manufacture evidence of criminal wrongdoing, and subject

Cox to prosecution.

### A. Sergeant Javier Fernandez Fabricated Evidence of Alcohol Impairment and Refusal of Roadside Sobriety Exercises.

155. Sergeant Javier Fernandez arrived after the officers had used force against Cox. Fernandez undertook a response-to-resistance investigation concerning the officers' conduct and questioned Cox about the events leading to the use of force.

156. Fernandez never requested that Cox perform roadside sobriety exercises. Cox never refused any such request from Fernandez.

157. Nevertheless, Fernandez falsely informed Officer Curtis Crews that Cox had refused roadside sobriety exercises. Fernandez thus reported a refusal he knew had not occurred.

158. Fernandez also falsely claimed that Cox exhibited signs of alcohol impairment, including an odor of alcohol on his breath and bloodshot or watery eyes.

159. Lorenzo repeated Fernandez's purported observation in the arrest affidavit, falsely alleging that Fernandez detected a strong odor of alcohol coming from Cox's breath and advised Cox that he was being investigated for driving under the influence.

160. Crews likewise incorporated Fernandez's false allegations into the DUI Test Report, recording signs of impairment and falsely documenting that Cox had refused three roadside sobriety exercises.

161. Fernandez knew his statements were false. He had personally interacted with Cox, had not requested roadside sobriety exercises, knew Cox had not refused those exercises, and knew Cox had not exhibited the signs of impairment Fernandez attributed to him.

162. Fernandez's fabrications became part of the official DUI paperwork and arrest affidavit and were forwarded for use in the criminal proceedings against Cox.

### B. Defendant Kevin Lorenzo.

163. On or about April 16, 2023, Defendant Lorenzo authored and swore to an arrest affidavit falsely accusing Cox of driving under the influence, battery on a law-enforcement officer, resisting an officer with violence, and resisting an officer without violence.

164. Lorenzo falsely alleged that Cox drove toward officers at a high rate of speed, drove around a marked police vehicle and onto a sidewalk, and entered a closed crime scene.

165. Lorenzo falsely alleged that Cox knowingly disregarded Officer Savinon's

commands to stop after Savinon made eye contact with Cox, flashed a light, and shouted at him.

166. Lorenzo falsely alleged that Cox refused to comply with Officer Paige's orders to exit his vehicle and stated that he "did not need to comply with Officer Paige's orders."

167. Lorenzo falsely alleged that Cox continued to defy officers' commands, physically resisted their efforts to handcuff him, and displayed an "intense amount of strength."

168. Lorenzo falsely alleged that Cox struck Paige in the back of the head during a physical struggle involving Paige, Carballo-Perez, and Lorenzo, and that Cox acted violently toward officers.

169. Lorenzo falsely alleged that Cox's driving and conduct demonstrated impairment, that Sergeant Fernandez detected a strong odor of alcohol on Cox's breath, and that Cox exhibited indications of alcohol and drug influence.

170. Lorenzo knowingly supplied false information concerning Cox's purported signs of impairment for inclusion in Crews's DUI Test Report.

171. Lorenzo falsely alleged in his arrest affidavit that Cox refused to provide a breath sample to Crews.

172. Lorenzo knowingly signed the Miranda form as a witness to a fabricated account that Cox received Miranda warnings at approximately 4:07 a.m., gave the recorded responses, and refused to sign the form.

173. Lorenzo signed the jurat on Crews's breath-alcohol-test affidavit knowing that its statements concerning the observation period and Cox's purported test refusal were false.

174. Lorenzo signed the jurat on Crews's refusal affidavit knowing that its account of a breath-test request, implied-consent warnings, and Cox's continued refusal was false.

175. Lorenzo subsequently falsely testified in deposition that he personally witnessed Cox's breath-test refusal from the hallway.

176. Lorenzo knowingly prepared and assisted in preparing these false accounts for use as evidence supporting the criminal charges against Cox.

177. Lorenzo falsely signed a DUI citation alleging Cox was driving under the influence and refused to submit to a breath test.

### C. Defendant Curtis Crews.

178. Curtis Crews was a certified breath-test operator with the City of the Miami Beach.

His duties included conducting breath-alcohol testing, observing subjects before testing, advising subjects of the consequences of refusing a test, and accurately documenting the testing process and any refusal, as required by Florida law.

179. Crews entered into an agreement with other Miami Beach Police Officers to falsely accuse Cox of refusing to give an alcohol breath test.

180. Crews personally completed and signed Cox's two-page DUI test report as the examiner. Crews knowingly entered false information in that report to support the accusation that Cox had driven while impaired.

181. Crews falsely recorded an odor of alcoholic beverage, bloodshot and watery eyes, fighting, and an uncooperative and cocky attitude, and concluded that Cox was impaired. Crews had not personally smelled alcohol on Cox's breath, observed bloodshot or watery eyes, or seen Cox fighting. He nevertheless knowingly included those false entries in the report he signed.

182. Crews also wrote "REFUSED" across the horizontal-gaze-nystagmus, walk-and-turn, and one-leg-stand portions of the report. Crews had not personally requested any field sobriety exercises from Cox. His entries knowingly created a false record that Cox had refused those exercises.

183. Crews fabricated a separate account that Cox refused to provide a breath sample unless officers "un-arrested" him and let him go home. Crews wrote that account in the report's remarks and identified it as an interaction he personally had with Cox at the station.

184. Crews falsely documented that, at approximately 3:37 a.m., he personally requested a breath sample, advised Cox of the consequences of refusal, and obtained a continued refusal after those warnings.

185. Crews signed the implied-consent form and falsely swore that the request, warnings, and refusal had occurred.

186. Crews further signed and swore to the breath-alcohol-test affidavit, which stated that an observation period began at 3:15 a.m. and identified Cox's result as "Subject Test Refused." Crews knowingly made a false statement about the observation period and refusal.

187. Crews also falsely recorded that he advised Cox of his Miranda rights at 4:07 a.m. and marked Cox's signature as "REFUSED."

188. Through these signed reports and sworn statements, Crews created documentary

evidence portraying Cox as impaired and as refusing DUI testing after warnings, even though no DUI investigation had occurred.

189. Crews recorded the false information knowing and intending that it would be recorded in official police documents and used as inculpatory evidence to support the DUI accusation against Cox.

## CAUSES OF ACTION

### COUNT I – Malicious Prosecution (DUI) – Under Florida Law

(Lorenzo, Crews, Fernandez, and Paige)

190. The allegations of paragraphs 1 through 17 and 98 through 189 are reaffirmed and incorporated herein by reference.

191. This is a cause of action for common law malicious prosecution.

192. Paige falsely signed a DUI citation alleging Cox was driving under the influence and refused to submit to a breath test.

193. At all relevant times, Defendants Lorenzo, Fernandez, Paige, and Crews were actively involved in initiating, instigating, and withholding exculpatory information during the criminal prosecution of Cox.

194. As a result of Defendants' actions, Cox was charged with DUI in Case No. ABAMDWE.

195. The criminal prosecution was initiated and continued by Defendants' fraud, corruption, perjury, fabricated evidence, abuse of process, and other wrongful conduct undertaken in bad faith as described in this count.

196. At all relevant times, Defendants knew that Cox did not exhibit signs of DUI, knew that Cox was never asked to submit to a breath test, and knew that Cox never struck or attacked law enforcement officers. Defendants knew there was no probable cause to believe Cox committed the criminal offense of DUI.

197. Officer Crews was in fact recorded on Body-Worn Camera footage telling Defendant Tucci (before Crews even met Cox) that Cox was going to be a refusal. Crews never took Cox into the station, much less the DUI room, and falsely alleged in his sworn reports, affidavits, and deposition that Cox refused to give a sample and was combative.

198. The prosecution was instituted without probable cause, as the facts known to Defendants before initiating the prosecution would not have warranted a reasonable person to believe that Cox committed the offense charged.

199. Contrary to Defendants' reports, affidavits, and sworn statements, Cox did not strike any officer, did not resist law enforcement with or without violence, did not refuse to exit his vehicle, did not exhibit signs of intoxication, and was never asked to perform roadside sobriety exercises or submit to a breath test, as further set forth in the incorporated allegations above.

200. Acting under color of state law, Defendants Lorenzo, Crews, Paige, and Fernandez initiated, instigated, and continued and/or caused the prosecution of Cox for conduct that was alleged to have occurred on April 16, 2023.

201. As a direct and proximate result of Defendants' actions and the original proceedings, Plaintiff suffered emotional anguish and suffering, embarrassment, and damage to his reputation, and he incurred attorney's fees and costs.

202. The DUI charge was dismissed, resulting in a favorable termination of the proceedings against Cox.

203. As a result of Defendants' actions, Cox was deprived of liberty and forced to defend against criminal charges without probable cause.

204. Defendants acted intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

205. The acts of the Defendants, and each of them, were wanton, willful, unlawful, malicious, and vicious, without regard for the system of justice in the United States. Defendants, and each of them, fully knew that Plaintiff has engaged in no criminal conduct, that there was no factual or legal basis for his prosecution, that his conduct was at all times legal.

WHEREFORE, Cox demands judgment against Lorenzo, Fernandez, Paige, and Crews for damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, and any other relief this Court deems just and proper.

**COUNT II – Malicious Prosecution (Felony Prosecution) – Under Florida Law**
(Lorenzo, Crews, Paige, and Fernandez)

206. The allegations of paragraphs 1 through 17 and 98 through 189 are reaffirmed and

incorporated herein by reference.

207. Paige falsely signed a DUI citation alleging Cox was driving under the influence and refused to submit to a breath test.

208. This is a cause of action for common law malicious prosecution.

209. As a result of Defendants' actions, Cox was charged with and prosecuted for committing battery on a law enforcement officer, resisting an officer with violence, and resisting an officer without violence in Case No. F23-7731.

210. The criminal prosecutions were initiated and continued by Defendants' fraud, corruption, perjury, fabricated evidence, abuse of process, and other wrongful conduct undertaken in bad faith as described in this count.

211. At all relevant times, Defendants knew that Cox did not exhibit signs of DUI, knew that Cox was never asked to submit to a breath test, and knew that Cox never struck or attacked law enforcement officers. Defendants knew there was no probable cause to believe Cox committed a criminal offense.

212. The prosecution was instituted without probable cause, as the facts known to Defendants before initiating the prosecution would not have warranted a reasonable person to believe that Cox committed the offenses charged.

213. Contrary to Defendants' reports, affidavits, and sworn statements, Cox did not strike any officer, did not resist law enforcement with or without violence, did not refuse to exit his vehicle, did not exhibit signs of intoxication, and was never asked to perform roadside sobriety exercises or submit to a breath test, as further set forth in the incorporated allegations above.

214. Acting under color of state law, Defendants Lorenzo, Crews, Paige, and Fernandez initiated, instigated, and continued and/or caused the prosecution of Cox for conduct that was alleged to have occurred on April 16, 2023.

215. As a direct and proximate result of Defendants' actions and the original proceedings, Plaintiff suffered emotional anguish and suffering, embarrassment, and damage to his reputation, and he incurred attorney's fees and costs.

216. The felony charges were dismissed, resulting in a favorable termination of the proceedings against Cox.

217. Defendants acted intentionally, in bad faith, or with malicious purpose or in a

manner exhibiting wanton and willful disregard of human rights, safety, or property.

218. As a result of Defendants' actions, Cox was deprived of liberty and forced to defend against criminal charges without probable cause.

219. The acts of the Defendants, and each of them, were wanton, willful, unlawful, malicious, and vicious, without regard for the system of justice in the United States. Defendants, and each of them, fully knew that Plaintiff has engaged in no criminal conduct, that there was no factual or legal basis for his prosecution, that his conduct was at all times legal.

WHEREFORE, Cox demands judgment against Lorenzo, Fernandez, Paige, and Crews for damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, and any other relief this Court deems just and proper.

**COUNT III – Fabrication of Inculpatory Evidence - Under 42 U.S.C. § 1983, Fourth and/or Fourteenth Amendments**

(Defendants Lorenzo, Crews, Fernandez)

220. The allegations of paragraphs 1 through 17 and 98 through 189 are reaffirmed and incorporated herein by reference.

221. The Defendant Officers beat and tased Cox without lawful justification.

222. After using that force, the Defendant Officers knowingly and intentionally fabricated inculpatory evidence, including false statements in DUI paperwork and an arrest affidavit, to manufacture a justification for Cox's stop and seizure and the force used against him.

223. The fabricated account was intended to conceal the officers' unlawful conduct by falsely portraying Cox as the person responsible for the encounter and its escalation.

224. The Defendant Officers knowingly created, supplied, or submitted fabricated inculpatory evidence that was forwarded to the State Attorney's Office, intending that prosecuting authorities rely upon that evidence to initiate and pursue criminal charges against Cox.

225. Through these false representations, the Defendant Officers caused the State Attorney's Office to believe that it had been presented with an intoxicated and belligerent person who had been physically violent toward officers and had refused to submit to a breath test.

226. The State Attorney's Office relied on the fabricated evidence in initiating and pursuing Cox's criminal prosecution for battery on a law enforcement officer, resisting an officer without violence, and DUI.

227. The fabricated DUI paperwork, including the false representation that Cox had refused to submit to a breath test, also caused the administrative suspension of his driver's license.

228. Cox's criminal prosecution and license suspension were direct and foreseeable consequences of the Defendant Officers' knowing fabrication and submission of false evidence.

229. The DUI and felony charges against Cox were dismissed, and the criminal proceedings terminated in his favor without a conviction.

230. At the time of this conduct, it was clearly established that police officers may not knowingly fabricate material inculpatory evidence and submit it to procure a seizure pursuant to legal process.

231. At all relevant times, the Defendant Officers acted under color of state law as law enforcement officers with the Miami Beach Police Department.

232. The Defendant Officers knowingly caused criminal proceedings to be instituted and continued against Cox through fabricated evidence, acting maliciously and without probable cause.

233. After his arrest and booking, a bail bondsman, acting on behalf of a surety, posted a surety bond before Mr. Cox's first appearance.

234. The surety bond transferred Mr. Cox from the physical custody of Miami-Dade County Corrections to the "exclusive custody of the surety." *Universal Bail Bonds, Inc. v. State*, 929 So. 2d 697, 699 (Fla. 3d DCA 2006).

235. As a condition of obtaining and maintaining his release through a surety bond, Mr. Cox was subject to a state-prescribed agreement with his surety. Fla. Admin. Code R. 69B-221.100.

236. The state-prescribed agreement imposed significant travel restrictions, including restrictions that prohibited Mr. Cox from departing the jurisdiction of the court without the written consent of both the court and the surety or its agent, and required him to notify the surety or its agent in writing before moving from one address to another.

237. Those restrictions affected Mr. Cox's freedom of movement. Aware of the restrictions, he traveled less while the criminal case was pending; when he did travel, he sought permission; and when he sold his home and changed his residence, he notified his bondsman as required.

238. Following his arraignment, Mr. Cox remained subject to the same surety bond and

its restrictions on his travel and change of residence. Those restrictions continued throughout the criminal prosecution and remained in effect until the proceedings terminated in his favor.

### A. Fourth Amendment Violation

239. Defendant Officers violated Cox's Fourth Amendment right to be free from unreasonable seizures by knowingly fabricating and submitting material inculpatory evidence that caused him to be seized pursuant to constitutionally infirm legal process.

240. The false statements and fabricated evidence were material to the criminal proceedings initiated against Cox.

241. Without the false statements and fabricated evidence, and with the omitted truthful information included, probable cause did not exist to support the charges against Cox.

242. After the commencement of judicial proceedings, Cox remained subject to the restrictions on his liberty imposed through the surety bond, including restrictions on his travel and change of residence.

243. Those restrictions continued throughout the criminal proceedings initiated and maintained through the Defendant Officers' fabricated evidence and would not otherwise have existed in the absence of those proceedings.

244. By knowingly fabricating material inculpatory evidence that caused the initiation and continuation of criminal proceedings against Cox, the Defendant Officers caused him to remain seized pursuant to constitutionally infirm legal process, in violation of the Fourth Amendment.

### B. Fourteenth Amendment Substantive Due Process

245. Cox possessed a liberty interest protected by the substantive component of the Fourteenth Amendment's Due Process Clause against being deliberately framed for criminal offenses through the knowing fabrication and use of material inculpatory evidence by government officials.

246. The Defendant Officers knowingly manufactured and submitted material inculpatory evidence for the purpose of concealing their own unlawful conduct, falsely incriminating Cox, and causing the State to exercise its criminal and administrative authority against him.

247. As a result of the fabricated evidence, Cox was compelled to answer criminal charges, submit to the authority and compulsory processes of the criminal court, retain counsel to defend against those charges, and bear the burdens of a criminal prosecution procured through evidence the Defendant Officers knew to be false.

248. The same fabricated evidence caused the administrative suspension of Cox's driver's license through the Defendant Officers' false representation that he had refused to submit to a breath test.

249. The deliberate manufacture and submission of false inculpatory evidence to subject Cox to criminal prosecution and administrative sanctions served no legitimate governmental purpose and was so arbitrary and egregious that it shocks the conscience.

250. By deliberately manufacturing and submitting material inculpatory evidence they knew to be false, and thereby causing the State to exercise its criminal and administrative authority against Cox, the Defendant Officers deprived him of liberty without due process of law, in violation of the Fourteenth Amendment.

WHEREFORE, Cox demands judgment against Lorenzo, Fernandez, and Crews for damages, punitive damages, injunctive relief, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney’s fees, and any other relief this Court deems just and proper.

**COUNT IV – Excessive Force – Under 42 U.S.C. § 1983, Fourth Amendment**
(Carballo-Perez)

251. The allegations of paragraphs 1 through 17 and 98 through 189 are reaffirmed and incorporated herein by reference.

252. At all relevant times, Defendant Jose Carballo-Perez acted under color of state law as law enforcement officers with the Miami Beach Police Department.

253. Defendant Carballo-Perez intentionally used force against Cox, including two taser deployments while Cox was on the ground with his hands in the air complying with commands given.

254. That force was excessive.

255. At the time Defendant Carballo-Perez deployed his taser, Cox posed no immediate threat to the safety of Defendant Carballo-Perez or any other officer and was not actively resisting

arrest or evading arrest by flight.

256. Cox was not accused of committing a serious criminal offense.

257. Defendant Carballo-Perez's use of force was objectively unreasonable under the circumstances and violated Cox's rights under the Fourth Amendment to the United States Constitution.

258. As a direct and proximate result of Defendant Carballo-Perez's violation of Cox's civil rights, Cox suffered damages, including mental anguish, permanent bodily injury, pain and suffering, and humiliation.

259. By reason of the acts, omissions, wrongs, and other conduct perpetrated by Defendant Carballo-Perez individually, in depriving Cox of valuable constitutional rights, it was necessary for the plaintiff to retain the services of legal counsel to secure redress for the deprivation of Cox's constitutional rights. Thus, plaintiff incurred substantial and reasonable attorney's fees and costs and is entitled to recover them from Carballo-Perez pursuant to 42 U.S.C. § 1988 and under Florida law.

WHEREFORE, Cox demands judgment against Carballo-Perez for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, and any other relief this Court deems just and proper.

**COUNT V – Excessive Force – Under 42 U.S.C. § 1983, Fourth Amendment**
(Paige)

260. The allegations of paragraphs 1 through 17 and 98 through 189 are reaffirmed and incorporated herein by reference.

261. At all relevant times, Defendant Leon Paige acted under color of state law as law enforcement officers with the Miami Beach Police Department.

262. Defendant Paige intentionally used force against Cox, including deploying the very dangerous and risky two-legged takedown of a person twice his size.

263. Defendant Paige did not deploy reasonable force that was necessary under the circumstances to effectuate a lawful arrest or seizure.

264. Defendant Paige deployed the takedown without warning, explanation, or any prior attempt to use lesser force.

265. Defendant Paige's use of a two-leg takedown constituted significant physical force and was gratuitous under the circumstances, as Cox was compliant, facing away from Paige, and had not been informed that he was being arrested or handcuffed.

266. Defendant Paige made no effort to temper, limit, or de-escalate the use of force before employing the takedown.

267. That force was excessive.

268. At the time Paige deployed force, Cox posed no immediate threat to the safety of Defendant Paige or any other officer and was not actively resisting arrest or evading arrest by flight.

269. Cox was not accused of committing a serious criminal offense.

270. Defendant Paige's use of force was objectively unreasonable under the circumstances and violated Cox's rights under the Fourth Amendment to the United States Constitution.

271. As a direct and proximate result of Defendant Paige's violation of Cox's civil rights, Cox suffered damages, including mental anguish, permanent bodily injury, pain and suffering, and humiliation.

272. Defendant Paige's use of force directly and proximately caused Cox to be taken to the ground and set in motion the subsequent use of force, including Cox's tasering.

273. Defendant Paige's excessive force was a proximate and legal cause of Cox's tasering.

274. By reason of the acts, omissions, wrongs, and other conduct perpetrated by Defendant Paige individually, in depriving Cox of valuable constitutional rights, it was necessary for the plaintiff to retain the services of legal counsel to secure redress for the deprivation of Cox's constitutional rights. Thus, plaintiff incurred substantial and reasonable attorney's fees and costs and is entitled to recover them from Paige pursuant to 42 U.S.C. § 1988 and under Florida law.

WHEREFORE, Cox demands judgment against Paige for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, and any other relief this Court deems just and proper.

**COUNT VI – Battery – Under Florida Law**

(Carballo-Perez or City of the Miami Beach)

275. The allegations of paragraphs 1 through 17 and 98 through 148 are reaffirmed and incorporated herein by reference.

276. Plaintiff suffered a harmful and offensive contact by Officer Carballo-Perez, when on April 16, 2023, Cox was tased numerous times while on the floor, with his hands up, and having shown no signs of resisting.

277. Cox did not consent to the touching.

278. Defendant Carballo-Perez was acting in the scope and furtherance of his employment.

279. Defendant Carballo-Perez acted intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. ***Alternatively,*** Defendant Carballo-Perez did not act intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.[1]

280. As a direct and proximate result of Paige and Carballo-Perez's conduct, Plaintiff suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, medical expenses. The losses are permanent and/or continuing and Plaintiff will continue to suffer losses in the future.

WHEREFORE, Cox demands judgment against Defendant Carballo-Perez or City of the

---

[1] It is well-settled that "the 'nature of Florida Statutes § 768.28 tends to require a plaintiff to plead alternative and inconsistent claims against a government entity and its employees.'" *Valdes v. Miami-Dade Cty.*, No. 12-22426-CIV, 2013 WL 5429938, at *5 (S.D. Fla. Sept. 27, 2013) (quoting *Petithomme v. Cty. of Miami-Dade*, No. 11-20525-CIV, 2011 WL 3648622, at *3 n.2 (S.D. Fla. Aug. 16, 2011)). "In fact, Section 768.28(9)(a) 'tends to cause plaintiffs to bring 'mutually exclusive' claims in the alternative against a government and its employees because the state is immune from acts committed with bad faith or malice, while employees must have acted with bad faith or malice to be held personally liable.'" *Garayoa v. Reina*, No. 16-20213-Civ-COOKE/TORRES, 2016 WL 3348536, at *2 (S.D. Fla. June 16, 2016) (quoting *Reyes v. City of Miami Beach*, No. 07-22680-CIV, 2007 WL 4199606, at *3 (S.D. Fla. Nov. 26, 2007)). As such, this and other state law claims plead employer and employee liability in the alternative.

Miami Beach for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

**COUNT VII – Battery – Under Florida Law**
(Paige or City of the Miami Beach)

281. The allegations of paragraphs 1 through 17 and 98 through 148 are reaffirmed and incorporated herein by reference.

282. Plaintiff suffered a harmful and offensive contact by Officer Paige.

283. Cox did not consent to the touching.

284. Defendant Paige was acting in the scope and furtherance of his employment.

285. Defendant Paige acted intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. ***Alternatively,*** Defendant Paige did not act intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

286. As a direct and proximate result of Defendant Paige's conduct, Plaintiff suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, medical expenses. The losses are permanent and/or continuing and Plaintiff will continue to suffer losses in the future.

WHEREFORE, Cox demands judgment against Defendant Paige or City of the Miami Beach for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

**COUNT VIII – Federal Civil Rights Violations – Failure to Intervene: Violation of the Fourth Amendment to the United States Constitution, Pursuant to 42 U.S.C. § 1983**
(Paige, Feldman, Lorenzo)

287. The allegations of paragraphs 1 through 17 and 98 through 189 are reaffirmed and incorporated herein by reference.

288. Defendants Paige, Feldman, and Lorenzo violated Cox's federal constitutional rights by failing to intervene and/or stop the excessive force alleged in Counts IV and V.

289. Officers Carballo-Perez and Paige deployed excessive and unprovoked force

against Cox in violation of the Fourth Amendment.

290. Cox posed no immediate threat to the safety of Defendant Paige or any other officer, was not actively resisting arrest, and was not accused of a serious crime.

291. Captain Feldman had the opportunity and ability to stop the force deployed against Cox, but failed to intervene.

292. Defendant Lorenzo had the opportunity and ability to stop the force deployed against Cox, but failed to intervene. He encouraged the force.

293. Paige had the opportunity and ability to stop the force deployed against Cox by Carballo-Perez, but failed to intervene.

294. It was clearly established that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986).

295. Defendants were physically able and had a realistic chance of stopping the excessive force deployed by their fellow officers, but they refused or failed to take reasonable steps to stop the excessive force.

296. Defendants allowed and/or failed to intervene to stop the violation of Cox's civil rights.

297. Defendants allowed and/or failed to intervene in Defendant Carballo-Perez and/or Paige's actions which exceeded the level of force necessary to enforce compliance with lawful commands.

298. At all relevant times, Defendants acted under color of state law as law enforcement officers with the Miami Beach Police Department.

299. As a direct and proximate result of Carballo-Perez and Paige's conduct, Cox suffered damages, including mental anguish, permanent bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, medical expenses. The losses are permanent and/or continuing and Cox will continue to suffer losses in the future.

WHEREFORE, Cox demands judgment against Defendants for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action,

reasonable attorney's fees, and any other relief this Court deems just and proper.

**COUNT IX – Federal Civil Rights Violations – Unreasonable Searches and Seizures Violation of the Fourth Amendment to the United States Constitution, Pursuant to 42 U.S.C. § 1983**

(Paige, Lorenzo, Tucci)

300. The allegations of paragraphs 1 through 17 and 98 through 189 are reaffirmed and incorporated herein by reference.

301. This cause of action is brought by Plaintiff against Defendants Leon Paige, Kevin Lorenzo, and Jose Tucci for deprivation of rights secured by the Fourth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983.

302. At all relevant times, Defendants acted under color of state law as law enforcement officers with the Miami Beach Police Department.

303. Paige intentionally committed acts that violated Cox's constitutional right not to be subjected to an unreasonable investigatory stop and not to be arrested without probable cause.

304. Paige initiated a traffic stop of Cox without reasonable suspicion or probable cause to believe that Cox had committed a traffic violation or other criminal offense.

305. During the traffic stop, Defendant Paige lacked probable cause or reasonable suspicion to believe that Cox posed a threat to officer safety, justifying his handcuffing.

306. Paige did not have probable cause or reasonable suspicion to believe Cox committed a crime during the course of the traffic stop.

307. Mr. Cox complied with orders issued by Paige to stop his vehicle, exit the vehicle, to turn around and to put his hands on his car.

308. Defendant Paige initiated a seizure of Cox by attempting to place him in handcuffs without probable cause or reasonable suspicion of criminal activity.

309. Defendant Paige further initiated the seizure without probable cause or reasonable suspicion to believe that Cox posed a threat to officer safety or a risk of flight.

310. Cox's non-violent response to Paige's unlawful order and attempted handcuffing was not criminal.

311. At the time of the arrest, no reasonable police officer could have believed there was probable cause to believe Plaintiff committed any criminal offense.

312. Defendant Lorenzo authored the arrest affidavit that falsely accused Cox of committing a crime.

313. Tucci transported Cox to the hospital and then to TGK for formal processing.

314. Because Plaintiff's arrest/detention was not supported by arguable probable cause or reasonable suspicion, Defendants violated Plaintiff's clearly established Fourth Amendment rights.

315. At the time Defendants arrested Plaintiff, Plaintiff had the right to be free from an illegal arrest and/or being taken into custody.

316. Defendants' unlawful arrest was willful, reckless, callous, intentional, and malicious in derogation of the Plaintiff's rights under federal and state law.

317. At all relevant times, Defendants acted under color of state law as law enforcement officers with the Miami Beach Police Department.

318. As a direct and proximate result of this conduct, Cox suffered damages, including mental anguish, permanent bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, medical expenses. The losses are permanent and/or continuing and Cox will continue to suffer losses in the future.

WHEREFORE, Cox demands judgment against Defendants for damages, punitive damages, prejudgment interest on liquidated damages as allowed by law, costs of this action, reasonable attorney's fees, and any other relief this Court deems just and proper.

**COUNT X – False Imprisonment/False Arrest – Under Florida Law**

(Paige, Lorenzo, Tucci, Fernandez, Carballo-Perez, and Crews or City of the Miami Beach)

319. The allegations of paragraphs 1 through 17 and 98 through 148 are reaffirmed and incorporated herein by reference.

320. Paige initiated the detention, ordered Cox out of his vehicle, and participated in taking him into custody.

321. Carballo-Perez assisted in taking Cox into custody and deployed his taser to effectuate the seizure.

322. Lorenzo assisted in the arrest, authored the arrest affidavit, and participated in the subsequent DUI documentation.

323. Fernandez, Crews, and Lorenzo instigated and directly procured Cox's arrest.

324. Tucci transported and maintained custody of Cox, refusing to release Cox once it became clear he committed no crime and was being lied on.

325. This is an action, under the common law of the State of Florida, for false arrest.

326. Defendants acted intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. ***Alternatively*,** Defendants did not act intentionally, in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

327. Cox was unlawfully detained and deprived of his liberty against his will when Defendants seized, detained, and arrested him without reasonable suspicion or probable cause. The arrest was unreasonable and unwarranted under the circumstances.

328. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity for the enjoyment of life, medical expenses. The losses are permanent and/or continuing and Plaintiff will continue to suffer losses in the future.

WHEREFORE, Cox demands judgment against Defendants for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

**COUNT XI – Excessive Force – Under 42 U.S.C. § 1983, Fourth Amendment**
(City of the Miami Beach)

329. Plaintiff realleges paragraphs 1-189.

330. Cox's Fourth Amendment right to be free from excessive force was violated by law enforcement, as alleged in Counts IV and V. Paige forcibly lifted Cox from his feet and took him to the ground despite Cox's compliance with his commands and the absence of any immediate threat. Carballo-Perez subsequently deployed his Taser twice against Cox while Cox lay on the ground, posed no immediate threat, and was attempting to comply with the officers' commands.

331. These constitutional violations were caused by the City's longstanding and widespread custom of tolerating excessive force against individuals who were compliant, subdued, or posed no immediate threat to officers, and its corresponding practice of failing to meaningfully investigate and discipline officers who used such force.

332. This was not an isolated problem unknown to the City. For decades preceding Cox's arrest, the City had received repeated notice that its officers used unnecessary force against nonthreatening individuals, frequently with other officers present, and thereafter relied on allegations of criminal conduct or resistance to justify their actions.

333. These incidents involved a recurring form of misconduct: officers used substantial force against individuals who were compliant, restrained, or posed no immediate threat; other officers or supervisors participated in or witnessed the encounters; and the force was followed in several instances by accusations of resistance or criminal wrongdoing. The City knew that this recurring misconduct presented a substantial risk of additional Fourth Amendment violations.

334. The City maintained written procedures governing the administrative review of officers' responses to resistance. But as a matter of custom, the City failed to meaningfully enforce those procedures, adequately scrutinize officers' asserted justifications for force, and take corrective action when officers used unnecessary force against nonthreatening individuals.

335. The City knew from prior complaints, litigation, investigations, and criminal proceedings that its existing supervision and disciplinary practices had failed to prevent repeated allegations of excessive force. Nevertheless, the City failed to correct the practices that allowed officers to use unjustified force and escape meaningful administrative accountability.

336. The City's repeated failure to meaningfully investigate and correct unjustified uses of force communicated to its officers that force against compliant or nonthreatening individuals would be tolerated, particularly when officers attributed the encounter to resistance or noncompliance. The City permitted this practice to continue despite knowing the substantial risk that officers would again violate the Fourth Amendment.

337. The constitutional violations against Cox were a foreseeable consequence of this custom. Paige used substantial force against Cox after Cox had complied with commands to stop his vehicle, exit, turn around, and place his hands against the truck. Carballo-Perez then deployed his Taser twice against Cox while Cox was on the ground, posed no immediate threat, and was attempting to obey commands. Captain Feldman and other officers were present during portions of the force and failed to prevent its continuation.

338. The officers subsequently attributed their force to Cox's purported violent resistance and noncompliance. Their official accounts repeated the same type of purported

justification that had accompanied prior allegations of unjustified force against Miami Beach officers.

339. Although Sergeant Fernandez conducted a response-to-resistance inquiry after the force against Cox, the City failed to subject the officers' actions to a meaningful independent administrative review that reconciled the claimed resistance with the body-worn camera evidence and Cox's observable conduct. The City's response reflected the same deficiencies in review and accountability that had persisted despite earlier warnings.

340. The City was deliberately indifferent to the known risk that its continued tolerance of unjustified force and deficient supervisory review would result in further constitutional violations. Rather than correct those practices, the City permitted them to continue, allowing its officers to use substantial force without reasonable justification and to rely on unsupported allegations of resistance to defend their conduct.

341. The City's longstanding custom and deliberate indifference were the moving force behind the excessive force inflicted upon Cox. The City's practices caused and foreseeably permitted the officers to use force against Cox without an objectively reasonable basis, resulting in physical injuries, pain and suffering, emotional distress, medical expenses, and other damages.

WHEREFORE, Cox demands judgment against the City of the Miami Beach for compensatory damages, prejudgment interest to the extent authorized by law, reasonable attorney's fees under 42 U.S.C. § 1988, costs, and such other relief as the Court deems appropriate.

**COUNT XII – Deprivation of Liberty - Under 42 U.S.C. § 1983, Fourth and/or Fourteenth Amendments**

(City of the Miami Beach)

342. Plaintiff realleges paragraphs 1-189 and 221-250 and 301-328.

343. Cox was unlawfully seized without reasonable suspicion or probable cause. Miami Beach Police Officers then knowingly fabricated criminal accusations against Cox, falsely alleging that he drove under the influence, disobeyed lawful police commands, violently resisted arrest, battered a police officer, and refused roadside sobriety exercises and a breath test. They deliberately incorporated those false accusations into sworn affidavits and official police reports, knowing the accusations were false, and caused the fabricated evidence to be used to initiate and maintain criminal charges against Cox and suspend his driver's license, in violation of his constitutional rights.

344. The constitutional violations committed against Cox were caused by the City's longstanding custom of tolerating the intentional creation of fabricated arrest affidavits and other official reports, utilized to cover up unlawful seizures.

345. As a matter of custom and practice, the City permitted its officers to manufacture justifications for unlawful arrests and excessive force by falsely accusing citizens of criminal conduct, including battery on law enforcement officers and resisting arrest.

346. This practice was neither isolated nor unknown to the City. For years preceding Cox's arrest, the City was on notice that its officers persistently created false official accounts portraying their victims as the persons responsible for the confrontations to cover up their unlawful conduct to justify unlawful force and unlawful seizures.

347. These incidents involved the same pattern: an unlawful seizure without probable cause or reasonable suspicion, followed by excessive force, and then false reports to justify the unlawful seizures. In several incidents, multiple officers, including supervisors, participated in creating or supporting the false accusations.

348. The City received notice of these practices through civil-rights complaints, criminal proceedings, police reports, body-worn camera recordings, Internal Affairs investigations, response to resistance reviews, and even litigation alleging that its officers had deliberately falsified official accounts of their encounters with citizens.

349. Before Cox's arrest, the City had received notice of repeated allegations that its officers manufactured criminal accusations to justify unlawful seizures. The City had also been specifically notified of a lawsuit accusing Paige, one of the officers involved in Cox's arrest, of participating in unjustified force, an unlawful seizure, and the initiation of false felony charges.

350. Despite these warnings, the City maintained a custom of failing to meaningfully investigate and correct the knowing submission of materially false information in arrest affidavits, criminal charging documents, and other official police reports. The City failed to take adequate corrective and disciplinary action to prevent officers from using false accusations of resistance, violence, and criminal conduct to justify their actions.

351. The City's practice permitted officers to rely on one another's unsupported accusations, incorporate those accusations into sworn documents, and present the resulting paperwork to prosecutors as reliable evidence of criminal wrongdoing without meaningful

accountability for deliberate falsehoods.

352. The City's longstanding tolerance of these practices communicated to its officers that false criminal allegations could be used to justify unlawful force and arrests without meaningful disciplinary consequences. The City knew that failing to correct these practices presented an obvious risk that additional citizens would be falsely accused of crimes and subjected to criminal proceedings based on fabricated evidence.

353. The City was deliberately indifferent to that known risk. Rather than correct the recurring practice of falsely documenting criminal conduct to conceal or justify police misconduct, the City permitted that practice to continue.

354. The constitutional violations against Cox followed the same pattern. Paige unlawfully stopped Cox. Paige, Carballo-Perez, and others then used unjustified force against Cox. The officers then falsely portrayed Cox as a reckless and intoxicated driver who had violently resisted arrest, struck a police officer, and refused lawful requests to perform sobriety exercises and submit to a breath test. They then falsely arrested him without probable cause.

355. The fabricated accusations were not independent mistakes by officers recounting a rapidly unfolding encounter. They concerned events the officers claimed to have personally witnessed or performed. Multiple officers prepared, signed, witnessed, or authenticated documents containing materially false accounts of those events.

356. The officers' coordinated fabrication was a foreseeable consequence of the City's longstanding custom of tolerating false criminal allegations and failing to meaningfully investigate and discipline officers who manufactured official justifications for unlawful police conduct.

357. The City's custom of tolerating fabricated inculpatory evidence, coupled with its deliberate indifference to the known need to correct that practice, was the moving force behind the officers' manufacture and submission of materially false evidence against Cox.

WHEREFORE, Plaintiff demands judgment against the City of the Miami Beach for compensatory damages, reasonable attorney's fees under 42 U.S.C. § 1988, taxable costs, prejudgment interest where authorized by law, and such other relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial as to all counts so authorized.

Respectfully submitted,

**KUEHNE DAVIS LAW, P.A.**
100 SE 2 Street, Suite 3650
Miami, FL 33131
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
johand@kuehnelaw.com
efiling@kuehnelaw.com

By: *S/ Michael T. Davis*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
***Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I certify on October 14, 2026, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify this document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

By: *S/ Michael T. Davis*
**MICHAEL T. DAVIS**