**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 26-CV-23906-RAR**

**JULIAN COX,**
Plaintiff,

vs.

**CITY OF MIAMI BEACH**, et al.,
Defendants.
_________________________________/

## RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS (DE43), WITH INCORPORATED MEMORANDUM OF LAW

On April 16, 2023, Miami Beach police officers took Julian Cox to the ground and twice tased him despite his attempts to comply. (DE35, ¶¶ 112-147). To conceal and justify their conduct, the officers fabricated an account portraying him as intoxicated, violent, and unwilling to submit to sobriety exercises or a breath test, then recorded those falsehoods in sworn affidavits and DUI paperwork. (DE35, ¶¶ 149-189). Mr. Cox was Executive Vice President for Food & Beverage at Riviera Dining Group. (DE35, ¶¶ 100-102). The encounter and resulting accusations destroyed his career. (DE35, ¶ 97). The State ultimately dismissed the DUI and felony prosecutions. (DE35, ¶¶ 152-153).

Plaintiff Julian Cox files his response in opposition to the joint motion to dismiss the First Amended Complaint (FAC) filed by Defendants City of Miami Beach (City), Leon Paige, Jose Carballo-Perez, Steven Feldman, Kevin Lorenzo, Javier Fernandez, Jose Tucci, and Curtis Crews. (DE43).

## FACTUAL BACKGROUND

On April 16, 2023, Mr. Cox was commuting home from work at approximately 2:11 a.m., when Officer Paige stopped Mr. Cox near Dade Boulevard and Meridian Avenue, although Mr. Cox had been driving lawfully. (DE35, ¶¶ 112-114). Mr. Cox complied with commands to stop, turn off his vehicle, and exit. (DE35, ¶¶ 114-116). Paige pointed his firearm at Mr. Cox and ordered him to turn around and put his hands on the truck; Mr. Cox complied. (DE35, ¶¶ 118-122). Paige did not explain the reason for the stop or tell him that he was being detained, arrested, or

handcuffed. (DE35, ¶¶ 117, 123).

While Mr. Cox faced the truck with his hands on it, Paige aggressively grabbed his arm from behind. (DE35, ¶¶ 123-124). Mr. Cox turned his head and upper body to see what was happening but did not kick, punch, or threaten any officer. (DE35, ¶ 125). Without warning, Paige lifted him off his feet in a two-leg takedown, while Captain Feldman held him and slowed his descent. (DE35, ¶¶ 126, 129). After Feldman moved, Mr. Cox landed on his back, and several officers pulled his limbs in different directions while directing him to put his hands behind his back. (DE35, ¶¶ 131, 134-135). The officers' restraint prevented him from moving freely to comply. (DE35, ¶ 135).

Officer Carballo-Perez pointed his Taser at Mr. Cox and told Paige to step back; Paige anticipated the Taser's use and pulled Feldman away. (DE35, ¶ 136). Once released, Mr. Cox remained on his back and did not attempt to escape or act aggressively. (DE35, ¶ 137). He immediately complied when Carballo-Perez told him to stop moving, but Carballo-Perez discharged the Taser after aiming it for approximately eight seconds. (DE35, ¶¶ 138-139). Officer Lorenzo then arrived, pointed his own Taser at Mr. Cox, and, after no more than fifteen seconds on the scene, shouted, “F***ing tase him.” (DE35, ¶¶ 143, 146). Carballo-Perez directed Feldman to release Mr. Cox and discharged his Taser a second time while Mr. Cox remained on the ground with his hands raised, offering no violence. (DE35, ¶ 147). The FAC alleges that Paige, Feldman, and Lorenzo had a realistic opportunity to stop the excessive force but failed to intervene. (DE35, ¶¶ 291-295).

Sergeant Fernandez arrived after the force and questioned Mr. Cox while conducting a response-to-resistance investigation. (DE35, ¶ 155). Fernandez never requested roadside sobriety exercises, yet falsely told Officer Crews that Mr. Cox had refused them and falsely attributed an odor of alcohol and bloodshot or watery eyes to him. (DE35, ¶¶ 156-158). Lorenzo incorporated Fernandez's account into the arrest affidavit, and Crews incorporated it into the DUI Test Report. (DE35, ¶¶ 159-160). Fernandez knew those accounts were false from his own interaction with Mr. Cox, but his fabrications were forwarded for use in the criminal proceedings. (DE35, ¶¶ 161-162).

Lorenzo authored and swore to an arrest affidavit falsely accusing Mr. Cox of driving under the influence, battery on a law enforcement officer, and resisting an officer with and without violence. (DE35, ¶ 163). The affidavit falsely claimed that Mr. Cox drove recklessly into a closed

crime scene, disregarded police commands, resisted handcuffing, struck Paige, and refused to provide Crews a breath sample. (DE35, ¶¶ 164-171). Lorenzo also knowingly witnessed or authenticated false accounts of *Miranda* warnings, breath testing, implied-consent warnings, and a test refusal. (DE35, ¶¶ 172-174). Paige signed a DUI citation falsely accusing Mr. Cox of driving under the influence and refusing a breath test. (DE35, ¶¶ 192, 207).

Crews completed and signed the DUI Test Report, falsely recording signs of impairment, fighting, and refusals to perform sobriety exercises that he had never requested. (DE35, ¶¶ 180-182). He also fabricated an encounter in which he requested a breath sample, gave the required warnings, and received a refusal, then recorded that account in signed reports and sworn statements. (DE35, ¶¶ 183-188). Before meeting Mr. Cox, Crews told Officer Tucci that Mr. Cox would be treated as a refusal; Crews never took him into the station or the DUI room. (DE35, ¶ 197). Tucci transported Mr. Cox to the hospital and then to TGK for processing, and the FAC alleges that he maintained custody after it became clear that Mr. Cox had committed no crime and the accusations against him were false. (DE35, ¶¶ 148, 313, 324).

The accusations led to Mr. Cox's arrest and felony and misdemeanor prosecutions, and the fabricated refusal caused the administrative suspension of his driver's license. (DE35, ¶¶ 150-151, 224-228). The State Attorney's Office ultimately dismissed the DUI prosecution. (DE35, ¶¶ 152, 202). Mr. Cox initially entered pretrial intervention on the felony charges, but after receiving exculpatory evidence from the DUI proceeding, the State dismissed the felony prosecution without requiring him to complete the remaining conditions of that agreement. (DE35, ¶¶ 152-153). Both criminal proceedings ended without a conviction. (DE35, ¶ 229).

## ARGUMENT

### I. Counts VI, VII, and X properly plead municipal and individual liability in the alternative.

Florida law immunizes a governmental entity from liability for an employee’s acts committed outside the scope of employment, in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard for human rights, safety, or property. § 768.28(9)(a), Fla. Stat. When those circumstances exist, the employee may be personally liable. "In any given

situation either the agency can be held liable under Florida law, or the employee, but not both." *McGhee v. Volusia County*, 679 So. 2d 729, 733 (Fla. 1996).

Counts VI, VII, and X plead battery and false imprisonment against the Defendant Officers and the City in the alternative. (DE35, ¶¶ 279, 285, 326). If the evidence establishes that the officers acted within the scope of their employment and without bad faith, malicious purpose, or wanton and willful disregard for Mr. Cox's rights, the City may be liable. If the evidence instead establishes the culpable conduct described in § 768.28(9)(a), the officers may be personally liable. Federal Rule of Civil Procedure 8 expressly permits alternative and inconsistent theories of liability. Fed. R. Civ. P. 8(d)(2)-(3). Rule 8(d)(2) provides: "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."

Courts in this district recognize that "the 'nature of Florida Statutes § 768.28 tends to require a plaintiff to plead alternative and inconsistent claims against a government entity and its employees.'" *Valdes v. Miami-Dade Cty.*, No. 12-22426-CIV, 2013 U.S. Dist. LEXIS 139335, 2013 WL 5429938, at *18 (S.D. Fla. Sept. 27, 2013) (quoting *Petithomme v. Cty. of Miami-Dade*, No. 11-20525-CIV, 2011 U.S. Dist. LEXIS 98152, 2011 WL 3648622, at *3 n.2 (S.D. Fla. Aug. 16, 2011)). "In fact, Section 768.28(9)(a) 'tends to cause plaintiffs to bring 'mutually exclusive' claims in the alternative against a government and its employees because the state is immune from acts committed with bad faith or malice, while employees must have acted with bad faith or malice to be held personally liable." *Garayoa v. Reina*, No. 16-20213-Civ-COOKE/TORRES, 2016 U.S. Dist. LEXIS 78518, at *7 (S.D. Fla. June 16, 2016) (quoting *Reyes v. City of Miami Beach*, No. 07-22680-CIV, 2007 U.S. Dist. LEXIS 86475, 2007 WL 4199606, at *3 (S.D. Fla. Nov. 26, 2007)); *Jewell v. Town of Davie*, No. 20-CV-61172-RAR (S.D. Fla. Dec. 16, 2020) (noting that the plaintiff "is not foreclosed from making inconsistent allegations at the pleading stage" on the issue of sovereign immunity).

The City's position illustrates why alternative pleading is appropriate. The City does not concede that its officers acted in bad faith or with malicious purpose; it has retained counsel to defend them. Florida law authorizes a municipality to provide counsel to its officers in civil actions, "unless, in the case of a tort action, the officer, employee, or agent acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety,

or property." § 111.07, Fla. Stat. The City's provision of counsel is consistent with the alternative theory that the officers acted without the culpable state of mind required for individual liability under § 768.28(9)(a).

The officers' position reinforces the need for alternative pleading. They deny that they acted unlawfully and seek dismissal of the claims against them, while the City relies on allegations of bad faith or malicious purpose to invoke immunity. If the evidence establishes actionable conduct within the scope of employment but without the culpable state of mind required for individual liability under § 768.28(9)(a), the City may be liable. Mr. Cox may plead that alternative. He need not elect a theory of liability before the evidence establishes the officers' state of mind.

As another court in this district explained, "At this stage, it is difficult—if not impossible—to determine where [the Defendant Officers] fall[] on this spectrum of culpability." *Williams v. Mia.-Dade Cty.*, 796 F. Supp. 3d 1125, 1132 (S.D. Fla. 2024). "And without knowing more about what [the Defendant Officers] intended, the Court cannot say the [City] is immune." *Id. See, e.g., Rice v. Fla. Dep't of Corr.*, No. 20-1206, 2023 U.S. Dist. LEXIS 91977, 2023 WL 3645606, at *4 (M.D. Fla. May 25, 2023) ("Although the agency and employee cannot both be held liable under § 768.28, a plaintiff may plead her claims in the alternative."); *Strong v. City of Naples*, No. 22-318, 2022 U.S. Dist. LEXIS 193436, 2022 WL 14029702, at *2 (M.D. Fla. Oct. 24, 2022) ("When a plaintiff pleads claims in the alternative, as here, they are read separately.").

Mr. Cox therefore need not elect between municipal and individual liability at the pleading stage. Counts VI, VII, and X preserve those alternatives until the evidence establishes which Defendant, if any, may be held liable under Florida law. Both theories should proceed to discovery.

## II. Counts XI and XII plausibly allege municipal liability.

A municipality is liable under 42 U.S.C. § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts . . . injury[.]" *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Although "a municipality cannot be subjected to § 1983 liability based upon theories akin to *respondeat superior*," *Anderson v. Atlanta*, 778 F.2d 678, 685 (11th Cir. 1985) (internal quotation marks omitted), municipal liability may attach "[w]hen an injury is inflicted as the result

of governmental policy or custom." *Id.* A plaintiff must show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation" to impose liability under § 1983. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). A "custom or policy" means either "(1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).

In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S. Ct. 1160 (1993), the Supreme Court "held that a court may not apply a heightened pleading standard more stringent than the usual pleading requirements of Rule 8 in civil rights cases alleging municipal liability under § 1983." *Passmore Swann v. S. Health Partners, Inc.*, 388 F.3d 834, 836 (11th Cir. 2004).

**A. The FAC plausibly alleges a municipal custom or policy.**

Counts XI and XII allege that, as a matter of custom, the City failed to enforce its procedures meaningfully for reviewing uses of force, investigate and discipline officers who used excessive force, and correct the submission of fabricated criminal accusations in arrest affidavits and other official police reports. (DE35, ¶¶ 331, 334-35, 350). These failures signaled to City officers that excessive force and fabricated criminal accusations would be tolerated without meaningful disciplinary consequences. (DE35, ¶¶ 336, 352). Despite repeated notice of these practices and the substantial risk of further constitutional violations, the City permitted the misconduct to continue without corrective action. (DE35, ¶¶ 335, 340, 350, 353).

Citing *Plowright v. Miami Dade County*, 102 F.4th 1358 (11th Cir. 2024), the City contends that the FAC offers only conclusory allegations of an unofficial custom or widespread practice. (DE43:13). In *Plowright*, the plaintiff "alleged in conclusory fashion that the county 'had a county wide custom of shooting . . . dogs.'" *Id.* at 1370. "Without any additional details about the circumstances of past incidents, however—including whether the dogs in question posed an imminent threat," the Court concluded that "Plowright failed to allege facts plausibly indicating that there was such a custom." *Id.*

The FAC supplies the factual detail missing from *Plowright*. It identifies 44 distinct prior

incidents of police misconduct, specifying the officers involved, the dates or approximate dates of the encounters, the nature of the misconduct, and, in numerous instances, the City's failure to discipline the responsible officers. (DE35, ¶¶ 22-51, 53-66, 69-94). Twelve incidents described in paragraphs 53 through 64 specifically concern false police reports or manufactured criminal accusations. (DE35, ¶¶ 53-64). These include officers who used excessive force and then fabricated accusations of battery, resistance, or other criminal conduct to justify their conduct. (DE35, ¶¶ 54, 58-59, 62-64).

For example, in November 2004, three officers assaulted a man and then falsified an arrest report accusing him of felony battery on a law enforcement officer. Prosecutors dismissed the charges, but Internal Affairs failed to hold every officer accountable for all of the alleged misconduct. (DE35, ¶ 54). In December 2008, Officer Peter Wyatt falsified reports accusing Edward Blackshear of disobeying commands and physically resisting arrest. Prosecutors dismissed the charges, and the City imposed no discipline. (DE35, ¶ 59). In 2011, Officers Eric Figueroa and Robert Azicri beat two men and collaborated to prepare false sworn arrest affidavits accusing them of disorderly conduct. Both prosecutions were dismissed. (DE35, ¶ 64).

The FAC also identifies more recent incidents. In July 2021, officers, including Captain Feldman, participated in or witnessed the unlawful use of force against Mariyah Maple and coordinated an arrest supported by a fabricated arrest affidavit. (DE35, ¶¶ 78-84). In December 2020, Defendant Officer Paige participated in an unlawful and violent arrest of William Sarubbi, whom officers falsely accused of battery on a law enforcement officer and resisting with violence. After reviewing body-worn camera footage, prosecutors dismissed the charges. (DE35, ¶¶ 88-91). On March 27, 2023, just twenty days before Mr. Cox's arrest, the City Attorney formally notified the Mayor and City Commission of Sarubbi's lawsuit against the City and Paige. (DE35, ¶¶ 92-95).

The FAC connects those incidents to the City's investigative and disciplinary practices. It alleges that the City maintained written procedures governing administrative review of officers' responses to resistance but, as a matter of custom, failed to enforce those procedures meaningfully, scrutinize officers' justifications for force, or take corrective action. (DE35, ¶ 334). The City knew through prior complaints, litigation, investigations, and criminal proceedings that its supervisory and disciplinary practices were inadequate, yet failed to correct them. (DE35, ¶¶ 335-36, 348-50).

Indeed, although Sergeant Fernandez conducted a response-to-resistance inquiry after Mr. Cox was tased, the City failed to conduct a meaningful independent review that reconciled the officers' account with the body-worn camera evidence. (DE35, ¶ 339). The City's repeated failure to investigate and discipline officers communicated that excessive force and fabricated criminal accusations would be tolerated without meaningful consequences. (DE35, ¶¶ 336, 350-53).

These allegations identify prior misconduct, the City's notice of that misconduct, its failure to take corrective action, and the continuation of the same practices. Accepted as true, they support a plausible inference of an unofficial municipal custom and deliberate indifference. (DE35, ¶¶ 340-41, 356-57).

The City also argues that the FAC improperly relies on settlements in which the City admitted no liability. (DE43:14). Mr. Cox relies on those settlements, together with the alleged underlying misconduct and the City's response, to support an inference of notice and deliberate indifference. The repeated civil rights complaints, criminal proceedings against individual officers, litigation status reports to the Mayor and City Commission, and settlements collectively support an inference of institutional awareness. The March 27, 2023, report concerning the Sarubbi lawsuit is one specific example. The sufficiency of those allegations does not depend on an admission of liability in a settlement agreement. (DE35, ¶¶ 67-95, 334-336, 348-353).

The City next contends that the FAC "relies upon several factually distinct incidents spanning over almost two decades." (DE43:15). The next sentence identifies the categories of alleged misconduct as "allegations of excessive force during arrests; others involve alleged unlawful detentions, interference with individuals recording police activity, purportedly false criminal accusations, or failures to document use-of-force incidents." (*Id.*).

Those categories correspond to the misconduct alleged here: excessive force, unlawful seizure, and fabricated criminal accusations. Their relevance must be assessed in relation to the particular municipal custom alleged.

The City's attempt to distinguish the Wade, Crudup, Maple, and Poitier incidents fares no better. It argues that the prior incidents cannot establish a municipal custom because none resulted in a judicial finding of unconstitutional conduct, apart from the criminal proceedings arising from Crudup. (DE43:14-17). That argument confuses proof with pleading. Mr. Cox need not establish at this stage that the prior incidents resulted in findings of liability. He must allege facts that

plausibly establish a widespread practice of misconduct that caused his constitutional injuries. *Hoefling*, 811 F.3d at 1280-81.

The alleged prior incidents also resemble Mr. Cox's arrest in material respects. In the Poitier incident, an officer used excessive force and then prepared an arrest affidavit containing false accusations. (DE43, at 15-16; DE35, ¶¶ 85-87). In the Maple incident, **multiple** officers used excessive force against a person recording police activity and then fabricated criminal accusations to justify her arrest. (DE35, ¶¶ 78-84). Defendant Captain Feldman participated in or witnessed that incident. (DE35, ¶¶ 78-84).

In December 2020, Defendant Paige participated in the unlawful seizure and arrest of William Sarubbi, whom officers falsely accused of battery on a law enforcement officer and resisting with violence. (DE35, ¶¶ 88-95). The FAC alleges that Paige, Feldman, and other officers participated in Mr. Cox's unlawful seizure and arrest, which they sought to justify through substantially similar accusations of battery and resistance. The alleged similarities thus extend to both the conduct and some of the officers involved. (DE35, ¶¶ 126-147, 163-168).

The allegations also extend beyond the filing of civil lawsuits. The July 2021 Crudup incident resulted in criminal proceedings, including an officer's guilty plea and another officer's jury conviction for battery. (DE35, ¶¶ 73-77). Before Mr. Cox's arrest, the City Attorney advised the Mayor and City Commission of the Sarubbi litigation, which alleged unlawful seizure and fabricated criminal charges involving Paige. (DE35, ¶¶ 92-94). These allegations support an inference that the City had notice of recurring misconduct by its officers.

The prior incidents need not be identical to Mr. Cox's arrest. In *Rivas v. Figueroa*, No. 11-23195-Civ, 2012 WL 1378161, at *3 (S.D. Fla. Apr. 19, 2012), Judge Scola denied Miami Beach's motion to dismiss a municipal liability claim arising from similar allegations: officers unlawfully seized and beat two individuals and then prepared false arrest affidavits to justify their actions. The court explained that prior incidents need not be "precisely identical" to establish a plausible municipal custom. *Id.* Likewise, in *Vasquez v. City of Miami Beach*, 895 F. Supp. 2d 1275, 1278 (S.D. Fla. 2012), the court rejected Miami Beach's argument that the alleged prior incidents were insufficiently similar to establish a custom of excessive force.

The City's reliance on *Buress v. City of Miami*, 2025 WL 1231951, at *7 (S.D. Fla. Apr. 28, 2025), does not require dismissal. There, the court reconsidered an order denying summary

judgment and determined that the evidence developed through discovery was insufficient to establish municipal liability. *Id.* Here, the question is whether Mr. Cox's allegations, accepted as true, plausibly establish the claimed custom. And while the City correctly observes that settlements do not constitute judicial findings of wrongdoing, neither do settlements or voluntary dismissals establish that the underlying misconduct did not occur. The City's exhibits may establish the procedural dispositions of those lawsuits; they do not establish whether the alleged misconduct occurred. *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

The City also faults the FAC for failing to allege that the Mayor or City Commission directed, authorized, or ratified the alleged misconduct. (DE43:17). That argument conflates distinct theories of municipal liability. A municipal custom may arise when policymakers acquiesce in a longstanding practice of misconduct, without expressly directing or ratifying each unconstitutional act. "[A] longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991); *Johnson v. Miami-Dade County*, 948 F.3d 1318 (11th Cir. 2020) ("In other words, Johnson does not need to prove that Gimenez had *actual* knowledge of constitutional violations to prevail—Johnson must prove only that there were enough violations over a substantial enough period of time to show that Gimenez *must have known* about the violations and, yet, failed to stop them.").

Taken together, the allegations describe recurring excessive force, unlawful seizures, and fabricated criminal accusations involving multiple officers and supervisors. The FAC connects that alleged custom to Mr. Cox's injuries: officers used unjustified force and then fabricated accusations of battery, resistance, and intoxication to justify their conduct and procure criminal charges. Whether the evidence establishes a sufficiently widespread practice, deliberate indifference, and causation is a question for a developed record. The present question is whether the alleged facts plausibly support those elements. They do. (DE35, ¶¶ 18-96, 149-189, 334-341, 350-357).

### B. The FAC plausibly alleges deliberate indifference to the need for training, supervision, and discipline.

The City argues that Mr. Cox's allegations of deficient training, supervision, and discipline are conclusory because the FAC does not "identify specific provisions that the City systematically

refused to enforce." (DE43:18). It also argues that the FAC fails to identify a final policymaker, a contention addressed below. (DE43:19).

The argument overlooks the custom alleged. Counts XI and XII allege that the City's longstanding custom of tolerating excessive force and fabricated police reports caused his injuries, not merely that the City provided inadequate training. (DE35, ¶¶ 329-57). The existence of written procedures does not foreclose liability for a contrary custom. In *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986), the Eleventh Circuit sustained municipal liability despite written rules because the City repeatedly failed to correct known violations. A longstanding and widespread custom is attributable to policymakers because they "must have known about it but failed to stop it." *Brown*, 923 F.2d at 1481.

The FAC supports that theory with numerous specific incidents involving excessive force, fabricated accusations of resistance, falsified reports, and failures to discipline officers. (DE35, ¶¶ 22-66). It details more recent incidents involving Wade, Crudup, and Maple, including criminal charges against five officers following the Crudup beating. (DE35, ¶¶ 67-84). On March 27, 2023, the City Attorney formally notified the Mayor and City Commission of civil-rights litigation involving Officer Paige, who participated in Mr. Cox's arrest just twenty days later. (DE35, ¶¶ 88-95). These allegations establish a plausible basis for actual or constructive knowledge and deliberate inaction.

The FAC also identifies the connection between the alleged custom and Mr. Cox's injuries. Mr. Cox alleges that the officers followed the same recurring pattern: excessive force against a nonthreatening individual, false accusations of resistance, fabricated sworn reports, and criminal prosecution. (DE35, ¶¶ 337-41, 343-57). That recurring misconduct also supports an inference of deliberate indifference to the need for corrective training and supervision. Rule 8 does not require Mr. Cox to identify every investigative rule the City disregarded or every disciplinary measure it should have imposed. It requires facts supporting a plausible custom and causal connection. *Hoefling*, 811 F.3d at 1279-81.

**C. The FAC need not identify a particular final policymaker.**

The City contends that Mr. Cox's municipal liability claims fail because he has not identified a final policymaker who engaged in repeated unconstitutional acts or knowingly permitted the alleged customs. (DE43:19). Relying on *Grech*, 335 F.3d at 1329-30, and *Hill v.*

*Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996), the City argues that identifying a particular final policymaker is necessary to establish an unconstitutional custom. The City also relies on *Marantes v. Miami-Dade County*, 649 F. App'x 665, 673 (11th Cir. 2016), to argue that Mr. Cox's allegations of deficient investigations and discipline are insufficient.

Two principles answer the City's argument. First, "[A] longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown*, 923 F.2d at 1481. *See Johnson*, 948 F.3d at 1330 (explaining that actual knowledge is unnecessary where violations over a substantial period establish that the final policymaker must have known about them and failed to stop them). Actual knowledge may be established in discovery, but constructive knowledge of a sufficiently longstanding and widespread practice also may support liability.

Second, the complaint need not identify a particular final policymaker. The "identification of the policymaker may often involve fact-sensitive inquiries." *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989). As the Eleventh Circuit explained, "The Supreme Court has spoken of establishing a municipality's final policymaker in evidentiary terms." *Hoefling*, 811 F.3d at 1280. The court therefore concluded that identifying and proving that a final policymaker acted on behalf of a municipality is "an evidentiary standard, and not a pleading requirement." *Id.* (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002)). *Hoefling* expressly distinguished *Grech* because that decision arose at summary judgment. *Id.* at 1281. *Hill* likewise concerned summary judgment, not the sufficiency of a complaint.

Nor does *Marantes* compel dismissal. There, the plaintiff identified only two incidents of excessive force and one deficient Internal Affairs investigation. 649 F. App'x at 673. Mr. Cox identifies numerous incidents over a much longer period, including several involving multiple officers and supervisors in the five years preceding his arrest. (DE35, ¶¶ 18-96). He also alleges that the City Attorney formally notified the Mayor and City Commission of litigation involving Officer Paige just twenty days before Mr. Cox's arrest. (DE35, ¶¶ 88-95). These allegations plausibly establish a longstanding custom, actual or constructive knowledge, and deliberate acquiescence.

**D. The FAC plausibly alleges causation.**

The City finally argues that the FAC fails to connect its persistent failure to investigate and

discipline officers to Mr. Cox's constitutional injuries. (DE43:19). Eleventh Circuit precedent recognizes the causal relationship the FAC alleges.

In *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985), the Eleventh Circuit recognized that "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct" and thereby "establish[] an unconstitutional custom." *Thomas v. Roberts*, 261 F.3d 1160, 1174 n.12 (11th Cir. 2001) (quoting *Fundiller*, 777 F.2d at 1443), judgment vacated, 536 U.S. 953 (2002), opinion reinstated, 323 F.3d 950 (11th Cir. 2003); *see also Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015). The "continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983." *Depew*, 787 F.2d at 1499. *Fundiller* also expressly addressed causation. An adequately alleged custom of permitting excessive force "provide[s] the causal link between the challenged conduct and the City's policy, because [the officers] would have been acting in accordance with the policy of allowing or encouraging excessive force." 777 F.2d at 1443.

Other courts have recognized the same relationship. In *Monaco v. City of Camden*, 2008 U.S. Dist. LEXIS 30825, at *34 (D.N.J. Apr. 14, 2008), the court explained that "[I]f, as Plaintiff argues, the City failed to conduct adequate investigations into excessive force complaints, then a heightened inclination of police officers to use excessive force would be a 'highly predictable consequence' of the City's inaction." Similarly, in *Merman v. City of Camden*, 824 F. Supp. 2d 581, 593-94 (D.N.J. 2010), the court recognized that "[w]ere a jury to credit plaintiff's proofs that the City inadequately investigated its officers' alleged use of excessive force and other constitutional violations and failed to properly supervise or discipline its officers, a reasonable fact-finder could, in turn, conclude that the City's action, or lack thereof, constituted deliberate indifference and proximately caused plaintiff's injuries."

The First Circuit likewise sustained a finding of causation in *Bordanaro v. McLeod*, 871 F.2d 1151, 1162-63 (1st Cir. 1989):

> The absence of a strictly enforced disciplinary system led the officers at the King Arthur Motel to believe they were above the law and would not be sanctioned for their misconduct. A sufficiently supervised, properly recruited, trained and disciplined group of officers would not have acted so far below the level of accepted police behavior. Based on all the foregoing, we affirm both the jury's finding that

> the plaintiffs' injuries were caused by a policy of the City of Everett and its imposition of § 1983 liability on the city.

In *Sanchez v. Gomez*, No. EP-17-CV-133-PRM, 2020 WL 1036046, at *32 (W.D. Tex. Mar. 3, 2020), the court concluded that "a reasonable jury could look at the evidence and determine that [the] Chief['s] failure to discipline communicated to the [officers] that these actions were not punishable, let alone unconstitutional." The court explained: "[I]t is not hard to imagine that Defendant Officers Gomez and Rivera may have used force because Chief Allen failed to reinforce the right behavior through discipline. Therefore, EPPD officers were 'emboldened' to act at least to the extent that they may have believed their use of force was acceptable."

In *Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 3713064, at *49 (W.D. Tex. Aug. 20, 2021), the court denied summary judgment because "a reasonable jury could conclude that an ***obvious*** consequence of failing to investigate or discipline officers accused of using excessive force would be additional constitutional violations involving excessive force." *Id.* (emphasis added).

The FAC alleges that same causal relationship. The City's persistent failure to investigate and discipline excessive force and fabricated reports communicated to its officers that the misconduct would go unpunished. According to the FAC, that custom encouraged the officers to use unjustified force against Mr. Cox and then fabricate criminal accusations to justify their conduct, knowing that the City would not meaningfully investigate or discipline them. Those allegations plausibly connect the City's inaction to the constitutional violations Mr. Cox suffered. They are sufficient at the pleading stage. (DE35, ¶¶ 336-341, 350-357).

## CLAIMS AGAINST THE DEFENDANT OFFICERS

### I. Count III plausibly alleges unconstitutional fabrication of inculpatory evidence.

In *Williams v. Aguirre*, 965 F.3d 1147, 1168-69 (11th Cir. 2020), the Eleventh Circuit explained that "[T]he law [is] clearly established that the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen if such false statements were necessary to the probable cause" (quoting *Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999)). That prohibition was established

by at least 1989. *Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997) ("It was well established in 1989 that fabricating incriminating evidence violated constitutional rights"). *Giglio v. United States*, 405 U.S. 150, 154 (1972), likewise recognizes that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice'" (citation omitted).

The knowing submission of false inculpatory evidence implicates due process and, when it causes a seizure pursuant to legal process, the Fourth Amendment. *See Aguirre-Jarquin v. Seminole Cnty.*, 158 F.4th 1276, 1298 (11th Cir. 2025) ("In *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977), our predecessor Circuit determined that constitutional due process is implicated when a state law enforcement officer offers false inculpatory evidence that the State uses to incriminate a suspect. We have reiterated *Schneider*'s holding multiple times in varying circumstances." (internal citations omitted)); *Washington v. Howard*, 25 F.4th 891, 903 (11th Cir. 2022) ("In *Manuel v. City of Joliet*, the Supreme Court held that, 'if the [probable-cause] proceeding is tainted . . . by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the' Fourth Amendment." (quoting *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n.8 (2017)) (alterations in original)).

Count III alleges that Lorenzo, Crews, and Fernandez knowingly fabricated inculpatory evidence in violation of Mr. Cox's constitutional rights. After officers beat and tased him without lawful justification, these defendants fabricated DUI paperwork and an arrest affidavit to justify the stop, seizure, and force. (DE35, ¶¶ 221-222). The fabricated account was intended to conceal the officers' unlawful conduct by falsely portraying Mr. Cox as responsible for the encounter and its escalation. (DE35, ¶ 223). The FAC alleges that Mr. Cox was not intoxicated, belligerent, or violent, and it incorporates body-worn camera footage of the encounter. (DE35, ¶¶ 115, 121, 130, 143, 149, 199).

The Defendant Officers' challenge to Count III turns on the constitutional source of the asserted right and the sufficiency of the alleged deprivation. The FAC pleads Fourth and Fourteenth Amendment theories in the alternative. For the reasons that follow, those allegations are sufficient to proceed beyond the pleading stage.

### A. The FAC plausibly alleges a continuing seizure.

The Defendant Officers correctly identify a seizure pursuant to legal process as an element

of a Fourth Amendment malicious prosecution claim. (DE43:21). In *Kingsland v. City of Miami*, 382 F.3d 1220, 1236 (11th Cir. 2004), the Eleventh Circuit distinguished ordinary pretrial-release obligations from a "significant, ongoing deprivation of liberty, such as a restriction on the defendant's right to travel interstate." *Id.* In *Kingsland*, the Court rejected the argument that a defendant was "subjected to a 'continuing seizure' for Fourth Amendment purposes because she was required to (1) pay a $ 1,000 bond; (2) appear at her arraignment; and (3) make two trips from New Jersey to Florida to defend herself in court, pursuant to the authority of the state." *Id.* at 1235. The court nevertheless left open the possibility that significant travel restrictions could constitute a continuing seizure.

The FAC alleges those additional restrictions. Mr. Cox's surety agreement prohibited him from leaving the court's jurisdiction without the written consent of both the court and the surety or its agent and required written notice before a change of residence. (DE35, ¶ 236). Those conditions affected his freedom of movement: he traveled less while the criminal case was pending, sought permission when he did travel, and notified his bondsman when he sold his home and changed his residence. (DE35, ¶ 237). The restrictions remained in effect after his arraignment and throughout the criminal proceedings. (DE35, ¶ 238). The FAC also identifies the state-prescribed agreement that imposed those conditions. (DE35, ¶ 235).

The Defendant Officers' contention that *Kingsland* involved the same conditions overlooks that distinction. The obligations identified there were a monetary bond, an arraignment appearance, and two trips to court. *Kingsland*, 382 F.3d at 1235. The opinion does not hold that the additional restrictions alleged here are insufficient as a matter of law.

**B. The FAC plausibly alleges a Fourteenth Amendment violation.**

In the alternative, Count III alleges that Mr. Cox possessed a liberty interest protected by the substantive component of the Fourteenth Amendment's Due Process Clause against being deliberately framed for criminal offenses through the knowing fabrication and use of material inculpatory evidence. (DE35, ¶ 245). The Defendant Officers' arguments do not warrant dismissal of that alternative theory.

First, they contend that the Fourteenth Amendment does not apply because the "Eleventh Circuit treats a fabrication-based challenge to a prosecution as a Fourth Amendment malicious-prosecution claim." (DE43:22). That reasoning assumes that the Fourth Amendment governs the

deprivation alleged. If the claim falls outside that Amendment's protection, its substantive due process basis must be considered separately. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) ("Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment. It is not."); *Carr v. Tatangelo*, 156 F. Supp. 2d 1369, 1377 (M.D. Ga. 2001), *aff'd*, 338 F.3d 1259 (11th Cir. 2003) (explaining that "when the Fourth Amendment is not implicated, such a claim must be analyzed as a substantive due process claim under the Fourteenth Amendment").

The Defendant Officers next contend that Mr. Cox suffered no deprivation beyond the alleged seizure because "he was never tried, convicted, or incarcerated after legal process." (DE43:22). The absence of a trial or conviction does not end the inquiry. "Whether the defendant is detained pre-trial or not, he experiences a deprivation of liberty when criminal proceedings against him are initiated." *Harris v. Town of Southern Pines*, 110 F.4th 633, 645-48 (4th Cir. 2024). *See Barnes v. City of New York*, 68 F.4th 123, 129-30 (2d Cir. 2023) ("Barnes's prosecution on the drug sale charge is itself a deprivation of liberty."). In *McDonough v. Smith*, 588 U.S. 109, 117 n.4 (2019), the Supreme Court observed that it was undisputed that the petitioner had "pleaded a liberty deprivation," where "[t]hough [petitioner] was not incarcerated pending trial, he was subject to restrictions on his ability to travel and other 'restraints not shared by the public generally.'" *Id.* (quoting *Justices of Boston Municipal Court v. Lydon*, 466 U. S. 294, 301 (1984)).

Several courts have recognized a due process claim when officials deliberately fabricate inculpatory evidence to initiate or maintain criminal proceedings, even though the accused is never convicted. These decisions support Mr. Cox's contention that release on bond and dismissal before trial do not foreclose his claim. *See Cole v. Carson*, 802 F.3d 752, 771-73 (5th Cir. 2015) (recognizing a "due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person"), *opinion reinstated in relevant part*, 935 F.3d 444, 451 & n.25 (5th Cir. 2019) (en banc); *Livers v. Schenck*, 700 F.3d 340, 348, 351, 354-55 (8th Cir. 2012) (allowing fabrication claims to proceed after dismissal of the criminal charges and explaining that "manufacturing false evidence may shock the conscience and can violate the Fourteenth Amendment's due process clause"); *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) (recognizing the right "not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government"); *see also Harris*, 110 F.4th at

646 ("Whether the defendant is detained pre-trial or not, he experiences a deprivation of liberty when criminal proceedings against him are initiated."); *Barnes*, 68 F.4th at 130 (explaining that "liberty may be deprived by consequences beyond custody"); *Ashley v. City of New York*, 992 F.3d 128, 138 (2d Cir. 2021) ("The plaintiff need not have been tried to make out this claim so long as some deprivation of liberty occurred.").

Here, the FAC alleges restrictions and restraints that the public does not share. Mr. Cox remained subject to travel and residence restrictions throughout the prosecution and was compelled to answer criminal charges and submit to the court's compulsory processes. (DE35, ¶¶ 236-238, 242-243, 247). The same fabricated evidence caused the suspension of his driver's license, which inhibited his ability to do his job. (DE35, ¶ 248). The FAC also alleges that the false accusations damaged his career: Mr. Cox was an executive vice president for food and beverage whose responsibilities included ensuring that employees did not drink at work, yet the officers portrayed him as intoxicated and belligerent. (DE35, ¶¶ 97, 100, 102, 149, 225). Whether or not the restrictions associated with the fabricated prosecution constituted a continuing Fourth Amendment seizure, Mr. Cox alleges that they deprived him of liberty protected by the Fourteenth Amendment. (DE35, ¶¶ 245-250).

*McKinney v. Pate* does not resolve that claim. Its distinction between state-created property interests and substantive due process rights does not answer whether the officers' deliberate manufacture of criminal charges deprived Mr. Cox of the constitutional liberty alleged here. 20 F.3d 1550, 1556-57 (11th Cir. 1994) (en banc). Count III alleges that the fabricated evidence compelled him to answer criminal charges and submit to the court's compulsory processes. (DE35, ¶¶ 245-247). The availability of review of the administrative license suspension therefore does not dispose of the alleged deprivation arising from the fabricated criminal prosecution.

## II. Counts I and II sufficiently allege malicious prosecution under Florida law.

"To effectively plead [malicious prosecution] under Florida law, the plaintiff must allege (1) the commencement of an original proceeding; (2) legal causation; (3) a bona fide termination in the plaintiff's favor; (4) the absence of probable cause; (5) malice; and (6) damages." *Steinmetz v. Pickholtz*, 414 So. 3d 309, 312 (Fla. 3d DCA 2025). Count I alleges that Lorenzo, Crews, Fernandez, and Paige maliciously prosecuted Mr. Cox for DUI. (DE35, ¶¶ 190-205). Count II

alleges that the same officers maliciously prosecuted him for battery on a law enforcement officer, resisting an officer with violence, and resisting an officer without violence. (DE35, ¶¶ 206-219). Lorenzo, Fernandez, and Crews do not challenge Count I. All four officers challenge Count II, and Paige separately challenges his alleged participation in both prosecutions. (DE43:22-23).

### A. Count II sufficiently alleges a bona fide termination of the felony prosecution in Mr. Cox's favor.

The Defendant Officers challenge the third element of Mr. Cox's malicious prosecution claim: whether the felony prosecution ended in a bona fide termination in his favor. They contend that the termination must occur in a manner that "indicates the innocence of the accused." (DE43:22). The Supreme Court rejected that requirement for Fourth Amendment malicious prosecution claims after examining the common-law tort. *Thompson v. Clark*, 596 U.S. 36, 39, 43 (2022). The Court explained that "the wrongful initiation of charges without probable cause is likewise the gravamen of the tort of malicious prosecution." *Id.* at 43. It concluded that "a plaintiff need only show that his prosecution ended without a conviction." *Id.* at 39. Although *Thompson* addressed a federal constitutional claim, its analysis of the common-law favorable termination requirement provides persuasive support for applying the same rule under Florida law.

The Court need not resolve that question here, however, because Mr. Cox has plausibly alleged a favorable termination even under the standard the Defendant Officers invoke. Florida courts have described a "bona fide termination" as one in which the proceeding "ended in a manner indicating the original defendant's (and current plaintiff's) innocence of the charges or allegations." *Doss v. Bank of Am., N.A.*, 857 So. 2d 991, 994 (Fla. 5th DCA 2003).

The FAC satisfies that standard. Mr. Cox entered pretrial intervention (PTI) on felony charges arising from the officers' accusations that he was a belligerent drunk who struck the police. The DUI proceeding continued. As the FAC alleges, "After the State Attorney's Office received exculpatory evidence from the DUI proceeding, it dismissed the felony prosecution without requiring Cox to complete the remaining conditions of his pretrial intervention agreement." (DE35, ¶ 153).

The Defendant Officers' reliance on *Hoffman v. Office of the State Attorney*, 793 F. App'x 945, 955 (11th Cir. 2019), does not compel a different result. There, the Eleventh Circuit reasoned that even if the plaintiff had not been required to complete PTI, that circumstance alone did not

establish a favorable termination. The dismissal remained contingent on the negotiated agreement, and "the plaintiffs identif[ied] no other circumstances tending to show that the prosecutor concluded that the 'evidence is lacking and that the charges are not provable.'" *Id.*

Mr. Cox alleges the circumstances missing in *Hoffman*. According to the FAC, the State received exculpatory evidence from the DUI proceeding and then dismissed the felony prosecution without requiring him to complete PTI. (DE35, ¶ 153). That sequence supports a reasonable inference that the exculpatory evidence prompted the dismissal. His earlier agreement to enter PTI does not foreclose that inference. The inquiry turns on the circumstances surrounding the eventual dismissal. *Doss*, 857 So. 2d at 995. Read in Mr. Cox's favor, the allegations plausibly establish that the State abandoned the felony prosecution because the exculpatory evidence undermined the charges. Count II therefore should not be dismissed for failure to allege a bona fide termination.

### B. Counts I and II sufficiently allege Paige's personal participation in Mr. Cox's prosecutions.

Paige argues that the DUI citation he signed "contains no statements attributed to him" and that the FAC groups him with his codefendants without identifying his individual role. (DE43:23). Both arguments overlook the same allegations: Paige signed a citation containing specific false accusations against Mr. Cox, and the FAC alleges that he helped initiate and cause the prosecutions. (DE35, ¶¶ 192-200, 207-214). The FAC identifies his conduct, and the attached citation supplies the statements he claims are missing.

First, Counts I and II expressly allege that Paige signed a DUI citation falsely accusing Mr. Cox of driving under the influence and refusing to submit to a breath test. (DE35, ¶¶ 192, 207). The attached citation identifies the accusations. The document bearing Paige's signature alleges that Mr. Cox "did unlawfully commit the offense of driving under the influence." (DE35-5:7). The citation also "immediately" suspends Mr. Cox's license for "refusal to submit to a lawful breath . . . test." (*Id.*). Paige's signature supplies the attribution that his motion says is absent. Read together, the express allegations and the signed citation plausibly establish that Paige adopted both accusations.

Second, the FAC identifies how Paige participated in the prosecutions. It alleges that he signed the false DUI citation and, together with his codefendants, initiated and caused the resulting

prosecutions. (DE35, ¶¶ 192-200, 207-214). Read together, those allegations connect Paige's specific act of signing the citation to the prosecutions it helped initiate.

The references to Paige's codefendants do not make his own role unclear. The FAC identifies him by name, specifies the document he signed, describes the false accusations it contains, and connects that document to the prosecutions. His alleged participation remains specific even though other officers contributed to the same result. Counts I and II therefore sufficiently allege Paige's personal involvement, and his request for dismissal should be denied.

### C. Count II sufficiently alleges a causal connection between Crews's fabrication and the felony prosecution.

Crews separately seeks dismissal of Count II, arguing that the FAC fails to connect his fabricated DUI evidence to the felony prosecution. (DE43:23). The FAC supplies that connection. Lorenzo's arrest affidavit included false allegations of DUI and a refusal to provide a breath sample to Crews. (DE35, ¶¶ 163, 169-171). Crews fabricated the corresponding breath-test and refusal documentation, knowing and intending that it would be used as inculpatory evidence against Mr. Cox. (DE35, ¶¶ 180-189). Read together, those allegations connect Crews's fabrication to the account presented in support of the prosecution.

As alleged, the fabricated refusal reinforced the officers' false accusations that Mr. Cox had committed battery on a law enforcement officer and resisted an officer with violence. The FAC further alleges that the defendants caused the prosecutions through fabricated evidence and that the State relied on that evidence. (DE35, ¶¶ 209-214, 224-226). These allegations identify Crews's own fabrication and support the inference that it contributed to the prosecution. Count II therefore plausibly alleges the causal connection he contends is missing.

## III. Counts IX and X sufficiently allege unlawful seizure and false imprisonment.

Count IX alleges unlawful detention and seizure under the Fourth Amendment against Paige, Lorenzo, and Tucci. (DE35, ¶¶ 300-318). Count X alleges false imprisonment under Florida law against Paige, Lorenzo, Tucci, Fernandez, Carballo-Perez, and Crews, or the City in the alternative. (DE35, ¶¶ 319-328). The moving officers contend that their respective roles did not amount to participation in Mr. Cox's unlawful custody. (DE43:24-25). That argument treats the initial physical seizure as the end of the relevant inquiry. Under *Wallace v. Kato*, 549 U.S. 384,

389-90 (2007), "false imprisonment is detention *without legal process*" and "a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges." Furthermore, "a participant in an arrest, even if not the arresting officer, may be liable if he knew the arrest lacked any constitutional basis and yet participated in some way." *Wilkerson v. Seymour*, 736 F.3d 974, 980 (11th Cir. 2013).

The distinction turns on the officer's conduct and knowledge. In Gallego v. Perez, No. 21-13212, 2024 WL 2930451, at *3 (11th Cir. June 11, 2024), the court granted qualified immunity to officers whose statements and gestures contributed to a seizure, while distinguishing the direct participation at issue in *Jones v. Cannon*.

In *Jones*, 174 F.3d at 1284, the Eleventh Circuit concluded that a reasonable jury could find the non-seizing officer "participated" in another officer's warrantless arrest because he "stayed with [the plaintiff] while [the arresting officer] called the state's attorney about probable cause," "was present during the [plaintiff's] interview," "took notes" that were used in the arrest report, "reviewed the report for accuracy," and, "[m]ore importantly, . . . transported [the plaintiff] to jail" with the arresting officer.

Here, the FAC alleges direct participation in Mr. Cox's custody, including the use and direction of force, preparation of the arrest affidavit, and transportation to jail. (DE35, ¶¶ 136-148, 163, 312-313, 321-324). The claims therefore turn on what each officer did and knew, rather than whether he first placed Mr. Cox under arrest.

### A. The FAC sufficiently alleges unlawful seizure and false imprisonment against Tucci in Counts IX and X.

Tucci contends that he cannot be liable because he neither participated in the initial arrest decision nor prepared the supporting documents. He also maintains that he could rely on the arresting officers' account. (DE43:24). Those arguments overlook the conduct and knowledge attributed to him during Mr. Cox's continued detention.

Tucci transported Mr. Cox to the hospital and then to TGK for formal processing. (DE35, ¶¶ 148, 313). The FAC also alleges that, before meeting Mr. Cox, Crews told Tucci that Mr. Cox would be treated as a refusal. (DE35, ¶ 197). Count X alleges that Tucci continued the transportation and confinement after it became clear that Mr. Cox had committed no crime and that the accusations against him were false. (DE35, ¶ 324). The asserted liability thus rests on

knowing participation in continued custody. In *Corbin v. Prummell*, 655 F. Supp. 3d 1143, 1160 (M.D. Fla. 2023), the court permitted an unlawful seizure claim against an officer who arrived after the initial encounter but personally assisted in the plaintiff's continued detention, including by attempting to move her toward a police vehicle. Tucci's alleged participation likewise continued the restraint on Mr. Cox's liberty.

The fellow officer rule does not cure the alleged absence of probable cause. "If the fellow officer himself lacks probable cause, there is nothing to impute." *Yessin v. City of Tampa, Fla.*, 613 F. App'x 906, 907 (11th Cir. 2015). As the Supreme Court explained, "an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971).

Here, the FAC alleges that the officers knew the accusations supporting Mr. Cox's arrest were fabricated. The complaint alleges that Mr. Cox did not attack Paige, drive while intoxicated, act violently or belligerently, resist arrest, or refuse to provide a breath sample. (DE35, ¶¶ 149, 199, 213). Tucci's alleged knowledge of the fabrication also defeats his contention that he reasonably relied on the other officers' account. (DE35, ¶ 324). *See Yessin*, 613 F. App'x at 907-08 ("The Defendants cannot rely on the 'fellow officer rule' where the fellow officer, himself, lacked probable cause."). The alleged facts thus support liability for Tucci's knowing participation in Mr. Cox's continued seizure and confinement.

Tucci separately argues that the FAC alleges no facts suggesting bad faith or malicious purpose. (DE43:24). But the FAC alleges that Crews announced the purported refusal to Tucci before meeting Mr. Cox and that Tucci continued transporting and confining Mr. Cox after learning that the accusations were false. (DE35, ¶¶ 197, 324). Those allegations support an inference of knowing participation in an unlawful detention and, in turn, bad faith or malicious purpose under section 768.28(9)(a). Tucci characterizes the allegation of knowledge as conclusory, but it must be considered together with the alleged communication from Crews and Tucci's continued custody. (DE43:24; DE35, ¶¶ 197, 324).

The City's reliance on the allegations of bad faith underscores why section 768.28 permits alternative claims against a municipality and its officers. Their respective immunity defenses depend on the officers' state of mind. As *Williams* explained in addressing a different officer's

conduct, "At this stage, it is difficult—if not impossible—to determine where Officer Rodriguez falls on this spectrum of culpability." *Williams*, 796 F. Supp. 3d at 1132. "And without knowing more about what Officer Rodriguez intended, the Court cannot say the County is immune." *Id.* The availability of an alternative claim against the City does not negate the allegations supporting Tucci's individual liability. Those allegations must be assessed on their own terms, and they plausibly describe knowing participation in an unlawful detention. Counts IX and X should therefore proceed against him.

**B. The FAC sufficiently alleges false imprisonment against Fernandez, Crews, and Carballo-Perez in Count X.**

"To be liable in an action for false imprisonment, one must have personally and actively participated therein, directly or by indirect procurement." *Johnson v. Weiner*, 19 So. 2d 699, 701 (Fla. 1944). Liability therefore may arise from conduct procuring the detention even when the defendant did not personally impose the physical restraint.

The FAC identifies the conduct attributed to each officer. Sergeant Fernandez personally questioned Mr. Cox during a response-to-resistance investigation. (DE35, ¶ 155). Although Fernandez never requested roadside sobriety exercises, he falsely informed Crews that Mr. Cox had refused them. (DE35, ¶¶ 156-57). Fernandez also fabricated signs of alcohol impairment, which were incorporated into the arrest affidavit and DUI paperwork. (DE35, ¶¶ 158-62). The FAC expressly alleges that Fernandez knew those representations were false because he had personally interacted with Mr. Cox and knew that the purported observations and refusal had not occurred. (DE35, ¶ 161).

Carballo-Perez personally assisted in taking Mr. Cox into custody and used his Taser to effectuate that seizure. (DE35, ¶ 321). The incorporated allegations describe two Taser deployments against a nonviolent man who had complied with the command to stop moving and remained on the ground with his hands raised. (DE35, ¶¶ 137-147, 319). Those allegations identify Carballo-Perez's direct participation in the confinement and support the pleaded claim of deliberate misconduct. (DE35, ¶¶ 321, 326-327). His arrival after Paige initiated the encounter does not, by itself, dispose of Count X.

Crews, in turn, created and signed reports falsely portraying Mr. Cox as impaired and as having refused testing after receiving the required warnings. (DE35, ¶¶ 180-88). He fabricated an

encounter in which he supposedly requested a breath sample and Mr. Cox refused unless the officers released him. (DE35, ¶¶ 183-85). The FAC alleges that these false accusations resulted in Mr. Cox being jailed, and Count X independently alleges that Fernandez and Crews instigated and directly procured the arrest. (DE35, ¶¶ 150, 323). Their alleged procurement of continued custody is not foreclosed merely because other officers first began the physical restraint.

### C. The FAC sufficiently alleges unlawful seizure and false imprisonment against Lorenzo and Carballo-Perez in Counts IX and X.

Lorenzo argues that his only alleged connection to Counts IX and X is his preparation of an arrest affidavit after other officers had seized Mr. Cox. (DE43:25). That argument disregards the incorporated allegations. The FAC alleges that Lorenzo arrived while officers were restraining Mr. Cox, drew his Taser, and pointed it at him, even though Mr. Cox was not punching, kicking, or otherwise attacking anyone. (DE35, ¶¶ 142-143). Lorenzo then demanded, "F***ing tase him," and Carballo-Perez complied by discharging his Taser a second time while Mr. Cox remained on the ground with his hands raised, offering no violence. (DE35, ¶¶ 146-147). Both Counts IX and X incorporate those allegations, and Count X separately alleges that Lorenzo assisted in the arrest, authored the arrest affidavit, and participated in the subsequent DUI documentation. (DE35, ¶¶ 300, 319, 322). These same facts establish Carballo-Perez also "assisted in taking Cox into custody." (DE35, ¶¶ 321-22). The FAC therefore identifies specific, affirmative acts by which Lorenzo participated in the seizure itself.

Lorenzo's role extended beyond documenting an arrest. He directed additional force while other officers were restraining Mr. Cox, and Carballo-Perez carried out that direction. (DE35, ¶¶ 142-147). Those acts plausibly establish Lorenzo's participation in the seizure itself. His later preparation of the arrest affidavit does not erase that alleged conduct.

## IV. The FAC sufficiently alleges Feldman's failure to intervene in Count VIII.

A law enforcement officer can be directly liable under § 1983 when he "fails or refuses to intervene when a constitutional violation . . . takes place in his presence." *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019). *See also Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable

under Section 1983."). Mr. Cox must plausibly allege that Captain Feldman was "(1) in a position to intervene in an ongoing constitutional violation and (2) failed to do so." *Williams v. Corr. Officer Radford*, 64 F.4th 1185, 1199 (11th Cir. 2023). The claim also requires an underlying constitutional violation: "An officer cannot fail to intervene when there is no constitutional violation to thwart." *Bolton v. Sheriff of Coweta Cty.*, 177 F.4th 1067, 1075 (11th Cir. 2026).

The FAC satisfies those requirements. Feldman characterizes the force as instantaneous and argues that he had no opportunity to intervene. (DE43:26). The FAC, however, describes an escalating sequence of physical restraint and two Taser deployments. (DE35, ¶¶ 124-147). Feldman was present during the takedown and remained involved while officers used force against Mr. Cox. (DE35, ¶¶ 129-136, 147). The FAC alleges that Mr. Cox was nonviolent, was not accused of a serious crime, and had not been told he was under arrest. (DE35, ¶¶ 125, 127, 137, 147, 290). It further alleges that Feldman had a realistic opportunity to stop the excessive force and failed to do so. (DE35, ¶¶ 291, 295-296).

The sequence supports that allegation. Before the first deployment, Carballo-Perez drew his Taser and told Paige to step back; Paige then pulled Feldman away from Mr. Cox. (DE35, ¶ 136). Carballo-Perez aimed the Taser for approximately eight seconds before firing at Mr. Cox, who had stopped moving. (DE35, ¶¶ 138-139). Before the second deployment, Lorenzo urged further force, and Carballo-Perez directed Feldman to release Mr. Cox. (DE35, ¶¶ 146-147). Those alleged warnings, actions, and intervals support an inference that Feldman had an opportunity to intervene before the Taser deployments. His characterization of the sequence as instantaneous does not foreclose the opposite inference at the pleading stage.

## V. The FAC sufficiently alleges excessive force, battery, and related failures to intervene in Counts IV through VIII.

Count IV (Carballo-Perez) and Count V (Paige) allege excessive force in violation of the Fourth Amendment. (DE35, ¶¶ 251-74). "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Wade v. Daniels*, 36 F.4th 1318, 1323 (11th Cir. 2022) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)). Excessive-force claims are governed by *Graham v. Connor*, 490 U.S. 386, 394-95 (1989), which "requires a court to consider the nature and quality

of the intrusion on the individual's Fourth Amendment interests against the countervailing government interest at stake." *Cantu v. City of Dothan, Alabama*, 974 F.3d 1217, 1229 (11th Cir. 2020).

"An officer's use of force is excessive under the Fourth Amendment if the use of force was 'objectively unreasonable in light of the facts and circumstances confronting" the officer.'" *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) (alterations in original) (quoting *Graham*, 490 U.S. at 397). "Proportionality is preeminent in the excessive-force context . . . ." *Patel v. City of Madison*, 959 F.3d 1330, 1340 (11th Cir. 2020). *See also Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (explaining that "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force"). "In considering an excessive-force case, a court should determine whether an officer's conduct in making an arrest is objectively reasonable or if it is an over-reactive, disproportionate action for the situation relative to the response of the apprehended person." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1317 (11th Cir. 2017).

To determine whether force was proportionate to the circumstances, courts consider several factors. "The quantum of force employed against an individual is weighed against (1) 'the severity of the crime at issue'; (2) 'whether the suspect posed an immediate threat to the safety of the officers or others'; (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight; (4) 'the need for the application of force'; (5) 'the relationship between the need and amount of force used'; and (6) 'the extent of the injury inflicted.'" *Castro-Reyes v. City of Opa-Locka*, 166 F.4th 886, 900 (11th Cir. 2026) (quoting *Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1239 (11th Cir. 2024)). Courts also consider "whether the force was applied in good faith or maliciously and sadistically." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).

The FAC alleges that when Carballo-Perez and Paige used force, Mr. Cox posed no immediate threat to the safety of the officers and was not actively resisting arrest or evading arrest by flight. (DE35, ¶¶ 255, 268). The FAC further alleges that Mr. Cox was not accused of committing a serious criminal offense. (DE35, ¶¶ 256, 269).

### A. The FAC sufficiently alleges excessive force and battery by Carballo-Perez in Counts IV and VI.

Carballo-Perez argues that Mr. Cox was actively resisting and that the Taser deployments were justified because he was "flailing his arms and verbally resisting while ignoring repeated

commands to stop moving and to place his hands behind his back." (DE43:26). That account conflicts with the FAC's allegations about the moments when the force was used. A clear recording that obviously contradicts the complaint controls, but ambiguities must be construed in the plaintiff's favor. *Baker v. City of Madison*, 67 F.4th 1268, 1277-78 (11th Cir. 2023). The question is therefore whether the recording plainly contradicts the specific allegations of compliance when Carballo-Perez used his Taser.

First, Mr. Cox had never been told that he was being handcuffed, detained, or arrested. (DE35, ¶ 127). That allegation bears directly on whether his movements reflected resistance. In applying the third *Graham* factor, the Eleventh Circuit has repeatedly considered whether the person knew that an officer intended to arrest him. *See Stryker v. City of Homewood*, 978 F.3d 769, 774-75 (11th Cir. 2020) (plaintiff "could not have been attempting to resist or evade arrest because, until he was tased, he had no indication that the officer intended to arrest him."); *Jones v. Ceinski*, 136 F.4th 1057, 1063 (11th Cir. 2025) (holding that a compliant motorist "could not have been attempting to resist or evade arrest because . . . he had no indication that the officer intended to arrest him" (quoting *Stryker*, 978 F.3d at 774-75)); *Oliver v. Fiorino*, 586 F.3d 898, 902, 906-07 (11th Cir. 2009) (finding the plaintiff "was not actively resisting arrest nor attempting to evade arrest by flight" even though he "slapped and pushed away" from an officer, where the officers "never informed Oliver" that they intended to take him into custody and he "was not threatened with arrest or apprehension at any time prior to (or after) the use of force"); *see also Hawkins v. Carmean*, 562 F. App'x 740, 742, 744 (11th Cir. 2014) (finding that a motorist's delay in exiting her car "did not support a reasonable belief that she was noncompliant or resistant" where "at no point during the encounter was Hawkins told that she was under arrest"); *Quinette v. Reed*, 805 F. App'x 696, 703 (11th Cir. 2020) (finding the plaintiff "never resisted" where the officer "gave no commands, warnings, instructions, or responses . . . . There was nothing to resist."); *Mills v. Parker*, 379 F. App'x 852 (11th Cir. 2010) (finding that a jury could find the arrestee was not passively resisting arrest by failing to show his hands upon command, where the arrestee did not hear the officers' commands because he was asleep after an overdose of Xanax).

In *Stryker*, an officer, "without warning, and without telling Stryker that he was under arrest," shot the plaintiff in the back with a taser as he walked toward his truck. 978 F.3d at 771. The district court characterized the plaintiff's conduct as noncompliance. The Eleventh Circuit

reversed, explaining that "the first indication that he was under arrest was a taser shot to the back." *Id.* at 775.

Likewise, the Eleventh Circuit recognized in *Fils* that a plaintiff "did not disobey any instructions (for none were given)." 647 F.3d at 1292.

Second, the FAC specifically alleges compliance before the first Taser deployment. Carballo-Perez drew his Taser, pointed it at Mr. Cox, and instructed Paige to step back. (DE35, ¶ 136). Paige understood that Mr. Cox was about to be tased and pulled Feldman away. (DE35, ¶ 136). Once the officers released him, Mr. Cox remained on his back and neither attempted to escape nor acted aggressively. (DE35, ¶ 137). Carballo-Perez told him to stop moving, and he immediately complied. (DE35, ¶ 138). After aiming the Taser for approximately eight seconds, Carballo-Perez fired while Mr. Cox remained on the ground with his hands raised, not moving and complying with the command. (DE35, ¶ 139).

The FAC includes the body-worn camera footage in support of its allegation that Mr. Cox had stopped moving when Carballo-Perez discharged the Taser. (DE35, ¶ 139):




Taken as true, the allegations state a plausible claim that Carballo-Perez used disproportionate force against a person who was complying and posed no immediate threat. (DE35, ¶¶ 137-147, 253-257). The same alleged conduct supports Count VI, which pleads harmful and offensive contact without consent. (DE35, ¶¶ 275-280). Because the defense to that battery claim rests on the asserted reasonableness of the force, it does not warrant dismissal on the facts alleged.

(DE43:27).

**B. The FAC sufficiently alleges Paige's and Lorenzo's failure to intervene in Count VIII.**

Paige and Lorenzo contend that Count VIII fails because Carballo-Perez used no excessive force. (DE43:27). That argument depends on rejecting the allegations discussed above. Paige was present before both Taser deployments and understood the warning that preceded the first. (DE35, ¶¶ 136-147). Lorenzo arrived before the second deployment and urged it. (DE35, ¶¶ 143-147). The FAC alleges that both officers had a realistic opportunity to intervene. (DE35, ¶¶ 292-295). Lorenzo disputes the allegation that he said, "F*ing tase him," and maintains that he instead said, "I'm gonna f*ing tase you." (DE43:27). The motion cites Exhibits 3 and 4 but identifies no precise timestamp for its competing account. The FAC alleges that Lorenzo urged further force and that Carballo-Perez responded by tasing Mr. Cox again. (DE35, ¶¶ 146-147). That alleged sequence supports Count VIII at the pleading stage.

**C. The FAC sufficiently alleges excessive force and battery by Paige in Counts V and VII.**

Paige contends that the takedown was justified because Mr. Cox reached toward the truck's open driver's-side door and struggled against handcuffing. (DE43:28). The FAC alleges a different sequence: Mr. Cox turned around, placed his hands on the truck, and then turned his head and upper body when Paige grabbed his arm from behind. (DE35, ¶¶ 122-125). It alleges that Mr. Cox did not kick, punch, or offer violence, and that Paige took him to the ground without warning or an explanation that he was being arrested or handcuffed. (DE35, ¶¶ 125-128). Those allegations bear directly on the asserted safety risk and resistance. Paige's competing description of the recording does not itself establish that the FAC's account is untenable. On the facts alleged, Counts V and VII plausibly challenge the proportionality of the takedown and the resulting harmful contact. (DE35, ¶¶ 260-274, 281-286).

## CONCLUSION

The Court should deny Defendants' motion to dismiss and require them to answer the First Amended Complaint.

Respectfully submitted,

**KUEHNE DAVIS LAW, P.A.**
100 SE 2 Street, Suite 3650
Miami, FL 33131
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
johand@kuehnelaw.com
efiling@kuehnelaw.com

By: *S/ Michael T. Davis*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
***Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I certify on November 25, 2026, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify this document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

By: *S/ Michael T. Davis*
**MICHAEL T. DAVIS**